## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

CSX TRANSPORTATION, INC.      *

     Plaintiff,      *

     v.      *      **CIVIL NO. JKB-19-2976**

SPINIELLO GLOBAL, INC., et al.,      *

     Defendants.      *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### MEMORANDUM

Plaintiff CSX Transportation, Inc. ("CSX") owns and operates a coal shipment facility (the "Facility") at Curtis Bay in Baltimore, Maryland. In 2014, CSX entered into a Right of Entry Agreement with the City of Baltimore to allow the City to update and repair the sewage lines running under the Facility. CSX initiated this action against Spiniello Global, Inc., Spiniello Companies, Inc. (collectively, "Spiniello") and the Mayor and City Council of Baltimore (the "City" and, collectively with Spiniello, the "Defendants") to recover costs for remediation it conducted after Spiniello, working as a subcontractor for the City, allegedly dumped sewage-contaminated water at the Facility. (*See generally* Compl., ECF No. 1.) CSX asserts claims for Breach of Contract (Count IV) and Indemnification (Count V) against the City,[1] and for Negligence (Count IX) and Trespass (Count X) against Spiniello.[2] (*Id.*)

---

[1] CSX also asserts, in the alternative, claims for Negligence (Count VI), Trespass (Count VII), and Nuisance (Count VIII) against the City. (Compl. ¶¶ 76–92, ECF No. 1.) CSX also initially brought three claims against the City related to distinct conduct in July 2017, referred to in the Complaint as the "First Incident." (*Id.* ¶¶ 7–20, 42–63.) CSX and the City have reached a settlement agreement on these claims and agree to voluntary dismissal of Counts I–III. (ECF No. 78.) The parties will be directed to file a notice of stipulation of dismissal pursuant to Federal Rule of Civil Procedure 41(a)(1)(ii).

[2] The Court previously granted the parties' stipulation of dismissal of Count XI against Spiniello. (ECF No. 89.)

Currently pending before the Court are Motions for Summary Judgment filed by Spiniello (ECF No. 103) and CSX against the City. (ECF No. 105.)  Also pending are several Motions related to various discovery and evidentiary issues, including: Defendants' Motion to Dismiss for Spoliation of SCADA Data (ECF No. 90); Defendants' Motion to Dismiss for Failure to Disclose and Supplement Material Evidence (ECF No. 91); Spiniello's Motion to Dismiss for Witness Tampering and Obstruction (ECF No. 92); Defendants' Motion to Dismiss for Spoliation of Communications to Coal Owners (ECF No. 93); Defendants' Motion to Strike Plaintiff's Expert Kiernan Purcell Pursuant to Federal Rule of Evidence 5-702 (ECF No. 95); Defendants' Motion to Strike Plaintiff's Expert Kiernan Purcell for Conducting Prohibited and Untimely Fact Discovery (ECF No. 96); Defendants' Motion to Strike Plaintiff's Expert John Shaw for Conducting Prohibited and Untimely Fact Discovery (ECF No. 97); Defendants' Motion *in Limine* to Exclude Testimony or Evidence Regarding Any Incidents Now Precluded by the Local Government Tort Claims Act and the Statute of Limitations (ECF No. 99); Defendants' Motion to Strike Plaintiff's Expert John Shaw Pursuant to F.R.E. 702 (ECF No. 100); Defendants' Motion *in Limine* to Exclude or Redact Nicholas Fazio's 12.12.18 Inspector's Daily Report and Mohammed Rahman's 10.15.18 Email (ECF No. 101); and CSX's Motion to Permit an Adverse Inference from the Fifth Amendment Invocations of Miguel Mendez (ECF No. 102). The Motions are fully briefed and no hearing is required. *See* Local Rule 105.6 (D. Md. 2023).

This is a case riddled with factual disputes about the appropriateness of the conduct that occurred in the immediate aftermath of and emergent circumstances of a spill of toxic materials. Not surprisingly, the Court's ultimate finding is that these issues should be decided by a jury. Accordingly, the pending dispositive Motions will be denied. The Court will discuss the resolution of each Motion in detail below.

## I.    *Background*

### A. *Curtis Bay Terminal and the Water Filtration System*

CSX is an interstate rail carrier that provides rail transportation services and operates the Curtis Bay terminal at the center of this lawsuit, a rail facility that receives and stores coal before it is loaded onto barges or ships. (Pankey Dec. ¶ 7, ECF No. 120-2; Zacker Dep. at 44:8–11, ECF No. 105-4.)[3] "Given the Facility stores large piles of coal, it maintains a dust suppression system that uses high-powered sprayers to wet the coal piles down to prevent coal dust migration and to comply with a Maryland Department of Environment ('MDE') Air Permit." (Pankey Dec. ¶ 8, ECF No. 120-2.)

This dust suppression system is a "closed-loop water filtration and distribution" system that collects recycled dust suppression water and water from precipitation events, treats that water, and either cycles it back to the sprayers for dust suppression or discharges it into Curtis Bay.[4] (Shaw Dep. at 9:19–24; Zacker Dep. at 44:14–45:5, 75:7, ECF No. 105-4.)

The coal piles at the Facility are all surrounded by drainage ditches to collect rain water or recycled coal rinse water. (Zacker Dep. at 55:3–4, 58:18–20 ECF No. 105-4.) Thus, "[a]ny water the system collects will be continually reused." (Pankey Dec. ¶ 13, ECF No. 120-2.) Generally speaking, after water enters the system through a drainage ditch, it first goes into the main basin to allow solids to settle and then is pumped into three secondary settlement/storage tanks, each of which have a maximum capacity of 1.7–2.2 million gallons. (Zacker Dep. at 73:10–74:16, ECF

---

[3] Pin cites to the record refer to the page generated by the electronic filing system, with the exception of deposition testimony, which is cited to the page and line number of the transcript, and documents with numbered paragraphs.

[4] The system is referred to as the "storm water treatment system," the "dust suppression system," and the "water filtration system." While there may be slight variances in what each term refers to, for the purposes of this Memorandum, the Court uses them interchangeably.

3

No. 105-4; Operations & Maintenance Manual, Curtis Bay Piers Facility Storm Water Treatment System ("Operations & Maintenance Manual"), ECF No. 103-9 at 3–4; MDE Investigation Rep., ECF No. 105-27 at 2.) From there, the water goes through a sand filter either to a storage tank from which it would be sprayed onto coal piles for dust suppression, or—if there is too much water in the system—to the ion exchange and into Curtis Bay. (Zacker Dep. at 74:17–75:5, ECF No. 105-4; MDE Investigation Rep., ECF No. 105-27 at 2.)

The system is designed to remove metals, not bacteria. (Zacker Dep. at 45:7–10, ECF No. 105-4.) The water filtration system was relatively new at the time of the events at issue, having been completed in 2016 or 2017. (Pankey Dep. at 79:6–9, ECF No. 105-6.) CSX hired Bruno Reyntjens, of PCMA Systems, "to manage the wastewater treatment system." (*Id.* at 75:20–21.)

CSX's MDE National Pollution Discharge Elimination System ("NPDES") Permit set parameters for any water discharged into Curtis Bay. (Pankey Dec. ¶ 19, ECF No. 120-2; Summers Dep. at 77:16–19, ECF No. 120-11.) Under the NDPES Permit, CSX was required to monitor several indicators in the water, including total residual chlorine. (Pankey Dec. ¶ 22, ECF No. 120-2.) Until about October 3, 2018, CSX used chlorine to disinfect the water in the filtration system and control biological growth. (Shaw Dep. at 10:15–23, 11:5–8, ECF No. 103-14.) CSX's Operations & Maintenance Manual for the water filtration system describes this step as "essential to proper operation of the storm water treatment" and states that "[t]here are no workable alternate operating modes for this facility." (Operations & Maintenance Manual, ECF No. 103-9 at 6.) To comply with its Permit requirements, CSX then dechlorinated the water prior to discharging it into Curtis Bay. (Pankey Dec. ¶ 20, ECF No. 120-2; Shaw Dep. at 11:10–18, ECF No. 103-14; Operations & Maintenance Manual, ECF No. 103-9 at 10.)

However, "[w]hen using potable water from the City, CSX would have difficulty

4

dechlorinating the water in the water filtration system to an acceptable level under the NPDES Permit." (Pankey Dec. ¶ 20, ECF No. 120-2.)  In September 2018 "[t]he total residual chlorine detected was in excess of the amount permitted under the NDPES Permit" and CSX therefore stopped chlorinating the water in the system on about October 3, 2018 "to ensure any water that was discharged complied with the parameters set forth in the NPDES Permit." (*Id.* ¶¶ 26, 27; *see also* Summers Dep. at 78:1–2, ECF No. 120-11 ("there were high levels of total residual chlorine in the effluent at time prior to 2018"); Cassino Dep. at 100:4–21, ECF No. 120-10 (acknowledging that the water in the filtration system was chlorinated during the approximately one-year time period leading up to October 12, 2018 based on reports he reviewed, sometimes with an excessive amount of chlorine).)  One of CSX's proffered experts, John Shaw, noted that he "might have gone a different route" to ensure compliance with the Permit, such as dechlorinating the water or managing the discharge differently.  (Shaw Dep. at 12:4–13, ECF No. 120-8.)

### B. *Right of Entry Agreement and Spiniello's Work*

CSX and the City entered into a Right of Entry Agreement to allow the City access to CSX's property to rehabilitate manholes and sewer lines running under the property.  (*See generally* Right of Entry Agreement, ECF No. 105-2.)  The City hired Spiniello as a contractor to clean out and reline sewer pipes.  (Cornish Dep. at 25:15–26:2, ECF No. 105-3; Fazio Dep. at 43:21–44:9, ECF No. 105-10.)  Spiniello started work at the Facility sometime around September 2018.  (MDE Investigation Rep., ECF No. 105-27 at 2 ("Spiniello has been working in the vicinity of the property for approximately 2 months and on site within the last few weeks [as of October 18, 2018]."); Sept. 12, 2018 Inspector's Daily Rep., ECF No. 105-12 (referencing work activity by Spiniello); Timeline, ECF 105-25 at 3 (timeline of events prepared by City Inspector Nicholas Fazio noting that "Spiniello started working at the location on October 3, 2018").)

Spiniello's work entailed removing debris and blockages from the sewage line using a vacuum truck, also referred to as a "vac truck." (Cornish Dep. at 58:15–59:4, ECF No. 105-3; Mendez Dep. at 15:1–9, ECF No. 105-14; Shaw Rep., ECF No. 100-1 at 5.) To do this, workers sprayed high pressure water into the sewer line using a jetter nozzle to break material off the sewer walls, and sometimes workers would enter the manhole to physically scrape debris off the wall. (Fazio Dep. at 55:1–7, ECF No. 105-10; Cornish Dep. at 59:1–8, ECF No. 105-3.) The solids released during this process became mixed into the water, creating a "suspension of solids in water." (Summers Dep. at 15:16–16:9, ECF No. 105-15.)

The wastewater and waste debris from the sewer line were then vacuumed back into the tank of the vac truck using a hose. (Fazio Dep. at 57:3–9, ECF No. 105-10; Cornish Dep. at 59:9–15, ECF No. 105-3.) The liquids filled up more quickly than the solids, and when the tank was full, it would be dewatered using a discharge hose to decant water back into the sewer and make more room for solids. (Mendez Dep. at 19:19–20:12, ECF No. 105-14; Fazio Dep. at 57:10–20, ECF No. 105-10.) The vac trucks needed to be decanted multiple times a day, generally four to five times in an eight-hour period. (Fazio Dep. at 58:7–11, ECF No. 105-10; Mendez Dep. at 20:16–22, 68:23–69:6, ECF No. 105-14.) When dewatering, the operator would wait until the liquids in the vac truck were completely emptied before stopping the dewatering process. (Mendez Dep. at 69:7–15, ECF No. 105-14.)

The water that was decanted out of the vac truck was considered contaminated and was not supposed to be discharged into a ditch or the ground. (Cornish Dep. at 61:3–10, ECF No. 105-3; Fazio Dep. at 51:9–12, ECF No. 105-10; Jacobson Dep. at 63:6–11, ECF No. 105-26; Natale Dep. at 197:1–21, 207:6–19, ECF No. 120-3; Summers Dep. at 16:10–13, ECF No. 105-15.) The solids left in the vac truck were taken off site for disposal. (Mendez Dep. at 44:5–11, ECF No. 105-14.)

6

## C. *Events of October 12, 2018*

Jason Preston, Operations Supervisor for CSX, (Preston Dep. at 8:14–19, ECF No. 105-17), was driving through the Facility in the evening of October 12, 2018 when he "noticed that the bed [of a vac truck] was in the air and there was water coming out of their discharge line into the ditch[.]" (Preston Dep. at 20:20–21:5, ECF No. 120-14.) Miguel Mendez[5] was the operator of the vac truck and was controlling the vacuum and jetter nozzle at the time. (Fazio Dep. at 83:8, 83:20–21, 84:6–7, ECF No. 105-10.) Preston "confronted [the Spiniello crewmembers] and asked them if they were decanting into [the] ditch and they told [him] they were." (Preston Dep. at 21:11–14, ECF No. 120-14.) He then asked whether the water came out of the sewer, and they said that it had. (*Id.* at 21:14–16.) Preston further testified that when he initially confronted Mendez, "he said that was their standard things that they had been doing lately is just dumping it into that area -- into that ditch line." (Preston Dep. at 34:2–6, ECF No. 105-17.)

Spiniello admitted that on October 12, 2018 when operating the vacuum truck, "then-Spiniello employee Miguel A. Mendez mistakenly did not replace the hose for reprocessing the liquid into the sewer before draining the vacuum truck; when the vacuum truck was drained he discharged between approximately 50 to 100 gallons of liquid into, on information and belief, the ditch." (Spiniello's Am. Responses to Pl.'s First Set of Requests for Admission, ECF No. 103-12 at 3.)

In his deposition, Mendez acknowledged that he would not set up the vac truck or the discharge line and would just leave the discharge line where the previous crew had set it up, even if it was in the ditch. (Mendez Dep. at 44:12–25, ECF No. 105-14.) He affirmed that, on the day

---

[5] Miguel Mendez also goes by Mickey. (Mendez Dep. at 11:24–12:8, ECF No. 105-14.)

of the incident, the discharge hose was already in the ditch when he arrived at the site for his shift. (*Id.* at 45:1–7.) When shown a picture of a discharge hose right beside the ditch, he affirmed that this was how the hose was set up when he arrived on the day of the incident. (*Id.* at 84:1–9.)[6] Mendez remembered that he was approached by a CSX employee, but testified that he did not have a conversation with that employee. (*Id.* at 50:8–19.)

The ditch that Mendez discharged water into goes through a pump and then flows into the basin. (Shaw Dep. at 138:5–15, ECF 105-7; *see also* Shaw Rep., ECF No. 100-1 at 4 ("[T]he location of the discharge by Spiniello was in close proximity to the treatment plant which is the point of confluence of all of the dust suppression collection system.").) As contaminated water moves through the system, the level and concentration of contamination in any given spot will fluctuate and will grow over time with biological reproduction. (Shaw Dep. at 142:9–22, 143:16–144:2, ECF No. 90-15.)

### D. Extent of Contamination

Anne Pankey was an Industrial Hygienist and Environmental Supervisor for CSX until May of 2019. (Pankey Dep. at 15:13–21, ECF No. 105-6.) She learned about the spill on October 12, 2018 at around 7:00 p.m. from Chris Mills, then the Curtis Bay Coal Pier Facility Manager. (Pankey Dep. at 90:11–15, ECF No. 105-6.) She told Reyntjens to immediately shut down the pumps, because she had learned that "the ditch just prior to the basin was impacted, and [she]

---

[6] Mendez invoked his Fifth Amendment privilege against self-incrimination in response to more than twenty questions related to what prior crews had done; how many times he had discharged into the ditch; whether discharging in that manner had been going on for two weeks; the amount of material discharged into the ditch; what he told the shift foreman after he was caught; and pictures depicting the ditch where the discharge took place. (Mendez Dep. at 45:8–21, 47:8–22, 47:23–48:3, 48:4–16, 48:17–24, 48:25–49:8, 49:9–22, 49:23–50:7, 50:24–51:4, 51:5–15, 51:16–22, 51:23–52:4, 52:5–13, 65:23–66:6, 66:7–13, 66:22–67:3, 67:4–9, 67:24–68:22, 84:10–16, 84:17–24, 85:4–9, 85:10–15, 85:23–86:2, 86:6, ECF No. 105-14.)

wanted to make sure [the system was not] pumping water." (*Id.* at 90:22–91:3.) She then spoke to Preston, who told her that "when he spoke to the Spiniello employee who was observed doing this dumping, . . . the employee said, 'Well, this is where we always empty it.'" (*Id.* at 91:10, 91:17–21.) This comment made her "very concerned that this was an incident that had been going on longer than [CSX] knew about[.]" (*Id.* at 91:22–24.)

The same night, Pankey "conducted a visual inspection of the Facility and confirmed the component parts of the water filtration system were contaminated and there were signs of widespread contamination all around the Facility." (Pankey Dec. ¶ 30, ECF No. 120-2.) Pankey "personally observed contaminated sewage wastewater in the retention basin, in the ditch that lines the coal piles, in the three sediment tanks, and all around the Facility in areas where Spiniello was performing work." (*Id.* ¶ 31.) She also "personally observed Spiniello's contaminated equipment laying around the Facility without any precautions taken to prevent the spread of contamination." (*Id.* ¶ 32.)

Brian Zacker was the Regional Manager of Environmental Field Services for CSX, and was responsible for overseeing environmental compliance and assisting environmental managers across all of CSX facilities, including Curtis Bay. (Zacker Dep. at 20:18–19, 21:6–13, ECF No. 105-4.) He arrived at the Curtis Bay terminal on October 13, 2018 and looked at the basin, the tanks, and the drainage ditch line that runs the perimeter of the Facility surrounding the coal patch. (*Id.* at 185:12–16, 185:20–186:13.) He testified that "[e]very single thing that [he] observed was impacted with what appeared to be sewer debris, sewer water, and smelled pretty bad." (*Id.* at 187:5–7.) He also took photographs of what he observed. (*Id.* at 187:8–10.) One of Spiniello's proffered experts, Dr. Roger Summers, former Secretary of MDE (Summers Dep. at 15:3–15, ECF No. 105-15), acknowledged he had seen "photographic evidence which shows that some of this

9

water has gone into the ditch[.]" (*Id.* at 221:17–19.) "The wastewater had a 'chocolate milk'

appearance." (MDE Investigation Rep., ECF No. 105-27 at 2.) As Dr. Summers explained,

"usually sewage has a gray color to it. . . . [D]ischarge of decant water from the vac truck and the

chocolate milk appearance could be -- and this is conjecture -- fine suspended particles in the

decant water, as opposed to sewage itself." (Summers Dep. at 130:2–7, ECF No. 105-15.)

Pankey arranged for water samples to be taken and tested from areas believed to be

contaminated. (Pankey Dep. at 92:8–25, ECF No. 105-6; Pankey Dec. ¶ 33, ECF No. 120-2.) The

samples "tested positive for E. Coli and total coliform in amounts well in excess of the testing

parameters[.]"[7] (Pankey Dec. ¶ 33, ECF No. 120-2; MDE Investigation Rep., ECF No. 105-27 at

3 (noting that water samples collected on October 13, 2018 "from the ditch, basin, three (3) holding

tanks, water beyond the sand filter and water runoff from the coal piles" all "tested positive for

total coliform and E. coli.").) Shaw noted that the seven locations throughout the system were

selected "strategical[ly] in relation to the flow of water through the dust suppression system" to

"provide[] for a quick analysis of the potential contamination exposure."[8] (Shaw Rep., ECF No.

100-1 at 11–12.)

---

[7] "[C]oliform is a group of bacteria" and "[t]otal coliform is a way to quantify a concentration of coliform in a sample"; "fecal coliform is a subgroup of total coliform." (Shaw Dep. at 38:14–16, 19–20, ECF No. 103-14.) Escherichia coliform ("E. coli") is "the major species in the fecal coliform bacteria group" and is the only one that is "generally not found growing and reproducing in the environment," making it "a reasonable indicator of contamination via sanitary sewage," as it is used in the water utility industry. (Shaw Rep., ECF No. 100-1 at 12.)

The testing results from October 13, 2018 indicated levels of >2419.6 total coliform MPN/100 mL in the composite coal pile, storm water influent pre-ion exchange, furthest tank, and ditch near dozer refuel; 1011.2 total coliform MPN/100 mL in the tank closest to basin and the basin; and >533.5 total coliform MPN/100 mL in the middle tank. (ECF No. 105-21 at 2.) MPN stands for "most probable number." (Shaw Rep., ECF No. 100-1 at 12.)

[8] Shaw acknowledged that he "could not pinpoint" the exact locations of each sample because "one of the descriptions of site sampling was coal piles or something," which was too "generic[.]" (Shaw Dep. at 104:15–17, ECF No. 103-14.)

Pankey stated that these results "further confirm[ed] widespread contamination at the Facility." (Pankey Dec. ¶ 33, ECF No. 120-2; *see also* Shaw Rep., ECF No. 100-1 at 12 (explaining that the level of total coliform and E. coli detected in the samples "indicates that the presence of fecal coliform was not only present, but present in excessive concentrations throughout the dust suppression system, confirming the assumption that the contamination was present at the Site in areas which were within the influence of the dust suppression system"); Purcell Dep. at 33:7–24, ECF No. 105-28 ("The contamination made it to, at minimum, the point of the last treatment process [i.e. the ionic exchange unit] before discharge to the bay. And from there, it was recycled back into the dust suppression system based on [water sample testing] results.").) Shaw also explained that, "[g]iven that there was no other reasonable means by which CSX could otherwise quickly and precisely define the extent and duration of the contamination, they were left with no other reasonable choice other than to consider it to be throughout the Site in areas which were within the influence of the dust suppression system." (Shaw Rep., ECF No. 100-1 at 12–13.)

Despite these testing results, many uncertainties remained. Shaw explained that "[CSX] didn't know the extent of the contamination that they were up against" (Shaw Dep. at 98:13–14, ECF 105-7):

> There were things that could not be known . . . you had a contamination from a gravity sewer main that . . . served both domestic and industrial customers. That means that there are potentially contaminants present in that flow that are associated with all of those customers. So that is a very broad potential list of contaminants. Would it be great to know which contaminants are actually present? Sure. But that information was not available and could not have been available, and there was no way to evaluate, at that time, all the contaminants that were actually present versus the ones that could have been present.

(*Id.* at 98:24–99:13.) This is because, as Shaw explained, "it's not a steady-state condition. The fluctuation in potential contaminants over time varies greatly." (*Id.* at 99:23–25; *see also* Shaw

Dep. at 126:4–7, ECF No. 120-8 (testifying that E. coli and total coliform "are only two potential

contaminants associated with this spill[,]" and thus, while they are an indicator of contamination,

they are "[n]ot even close" to being "the end-all").)

Similarly, when asked whether he determined the volume of the sewer water that was

discharged into the system on October 12, 2018, Shaw answered: "there was nothing to evaluate.

There was no data to look at. . . . [W]e know it happened. We had a comment by the guy who did

it that said he's been doing it for a while." (Shaw Dep. at 160:9–17, ECF No. 120-8.) He added,

"[y]ou have so many competing things . . . it would be great to be able to extrapolate some data,

but there's no way we can reasonably do that with such limited data." (*Id.* at 161:9–13.)

Additionally, there is no data as to the level of bacteria in the system prior to October 12,

2018, as bacteria including E. coli was not a parameter CSX was required to track for its Permit.

(Purcell Dep. at 100:12–18, ECF No. 103-29; Pankey Dec. ¶ 22, ECF No. 120-2.) Purcell

explained that the lower levels of E. coli detected in a couple places—around 50 MPN/100mL—

"may be more indicative of what the expected levels of E. Coli may be on that site." (Purcell Dep.

at 103:16–18, ECF No. 103-29; *see also* Bullock Rep., ECF No. 103-20 at 5 ("Natural surface

waters almost always contain some background level of fecal coliforms, usually less than 15-20

[fecal coliforms ('fc')]/100 mL MPN.").)

E. coli in the system could also come from birds or wildlife. (Summers Dep. at 88:6–10,

ECF No. 105-15 (explaining that indicator organisms like E. coli "can come from both wildlife

and humans"); Purcell Dep. at 99:21–24, 100:5–11, ECF No. 103-29 (agreeing that E. coli or

bacteria could be naturally present in the water filtration system, "dependent on animals that are

on site . . . . I didn't necessary [*sic*] see any, but birds and things like that that you would innately

have some form of E. Coli that may be making it into the system").) Experts also agreed, however,

12

that the fact that it was a closed facility would limit the potential for fecal contamination from wildlife. (Shaw Dep. at 209:25–210:4, ECF No. 120-8 ("[T]his is a large commercial facility that is fenced, supervised. . . . [T]he wildlife component to that would almost certainly be limited to birds, which, in my opinion, would be very limited."); Duffy Dep. at 138:7–17, ECF No. 120-13 (acknowledging that the fact that this is a secured, fenced facility "would reduce the potential for contamination").) Shaw testified that, although some level of total coliform in the water would be acceptable, "[t]hese numbers indicate the presence of significant levels of total coliform." (Shaw Dep. at 125:3–8, 125:24–25, ECF No. 120-8.)

### E. Investigation

After the discovery on October 12, 2018, Spiniello was barred from the Property.[9] (MDE Investigation Rep., ECF No. 105-27 at 3; Mendez Dep. at 52:21–24, ECF No. 105-14.) Fazio, a contracted City Inspector at the Curtis Bay Facility, (Fazio Dep. at 24:13–17, 26:12–21, ECF No. 105-10), compiled a timeline of the period Spiniello had been working at CSX's property. (Id. at 76:6–9.) Starting on October 4, 2018, he identified several instances where City Inspectors had observed a vac truck hose laying over a jersey wall surrounding the ditch, on the ground, or next to a manhole, noting these could have posed a contamination risk. (Timeline, ECF No. 105-25 at 3–4; see also Fazio Dep. at 106:1–107:10, 115:13–116:19, 122:16–124:1, ECF No. 105-10.) Fazio also identified examples from photographs where the protective gear Spiniello employees wore when they had to enter the sewer were not properly contained in a staging area to avoid contamination. (Fazio Dep. at 67:4–68:19, 103:5–19, 104:10–18, ECF No. 105-10.) Angela

---

[9] CSX allowed Spiniello to return to the Facility in December 2018, and Spiniello completed its work at the Facility in January 2019. (Cornish Dec. ¶ 5, ECF No. 111-2.)

Cornish, a Construction Project Supervisor for the City, (Cornish Dep. at 13:11–14, ECF No. 105-3), acknowledged that, when she toured the facility a few days after the incident, CSX employees pointed out contaminated equipment that was left lying on the ground at the site, and that the equipment should not have been left like that. (Cornish Dep. at 100:13–18, 101:3–5, ECF No. 105-3.) Zacker noted that Spiniello "left unkept hoses all over the facility that were full of sewer water[,]" which CSX found "within a week or two of them being kicked off site"; CSX thereafter had the hose water sampled. (Zacker Dep. at 159:6–16, ECF No. 105-4.)

The MDE also conducted an investigation and in a report dated October 18, 2018, identified two violations of Environment Article Title 9 by Spiniello and Baltimore City. (*See generally* MDE Investigation Rep., ECF No. 105-27.)  As relevant here, it found that "[w]ater sampling results determined the CSX Transportation wastewater treatment plant and runoff water has tested positive for total coliform and E. coli. Sewage sludge in the form of floating solids was observed in the ditch and basin." (*Id.* at 3.)  To remedy this violation, it directed the City and Spiniello to "[i]mmediately coordinate with CSX Transportation to develop and finalize facility treatment plan. Immediately contact CSX Transportation to obtain directives on procedures to remove or cover pollutant materials in the form of uncapped hoses and any additional exposed equipment." (*Id.*)

### F. Remediation Work

The spill needed to "be cleaned up immediately." (Summers Dep. at 16:17–18, ECF No. 105-15.)  In addition to environmental impacts, sewage contamination poses industrial hygiene and human safety risks, as it can expose employees to conditions such as hepatitis, pink eye, or other diseases. (Zacker Dep. at 189:21–190:7, ECF No. 105-4; Summers Dep. at 87:5–10, 88:4–6, 88:13–15, ECF No. 105-15; Duffy Dep. at 51:15–21, ECF No. 105-16.)  The fact that

14

contamination had reached the coal piles was of particular concern from a health and safety standpoint in terms of potential for workers coming into contact with and accidentally ingesting biological agents. (Bullock Rep., ECF No. 103-20 at 5; Bullock Dep. at 43:11–16, ECF No. 120-6; Zacker Dep. at 190:4–6, ECF No. 105-4.)

CSX moved forward with a plan to decontaminate the entire water filtration system. Based on test results indicating sewage had made it all the way through the system, Zacker determined that fecal matter had come into contact with all the components within the system and thus they needed to be cleaned or replaced because "unless you disinfect everything . . . fecal will reproduce itself in a moist, wet environment." (Zacker Dep. at 194:3–8, 204:10–21, 208:16–209:3, ECF No. 105-4; *see also* Purcell Dep. at 76:6–12, ECF No. 105-28 ("[T]he test results that were collected in early October shortly after the incident . . . are indicative of a facility-wide issue, and . . . those results are good reason to go forward with the remedial and decontamination process that was put into place."); Shaw Dep. at 195:11–14, ECF 105-7 ("The problem is that if you operated that system while contaminated, it would then just spread the contamination. So . . . it made [the system] inoperable because it would exacerbate the problem.").)

CSX did not have the equipment to perform the necessary remediation, so it had to bring in HEPACO, a third-party emergency response contractor and the closest vendor with which it had a preexisting master service agreement. (Zacker Dep. at 81:8–9, 195:5–8, 195:11–12, ECF No. 105-4.) HEPACO performed work from October of 2018 through summer of 2019. (*Id.* at 86:21–87:3.)

Zacker explained that CSX first needed to get a permit from the City "to discharge the water that was in the surrounding ditches and all affected areas back into the manhole" and to get rid of the water that was used to disinfect the system. (*Id.* at 193:18–21, 194:8–10.)

Then, the first priority was to "make [the] coal acceptable to be shipped off-site and for a customer to accept it because every day that CSX was not able to move that coal [it was] losing millions of dollars." (*Id.* at 203:4–203:8.) Bleach would destroy the coal, so HEPACO had to "rinse that coal with water at a certain rate that was acceptable as not to just make it just a slushy slurry and wash everything away[.]" (*Id.* at 203:12–18.) CSX "isolated the contamination by switching their source [for the sprayers] to city potable water." (Shaw Dep. at 100:19–20, ECF 105-7.) In other words, CSX "bypass[ed] the recirculated water entering the dust suppression system using clean City supply water." (Purcell Rep., ECF No. 95-1 at 7.) "The flushing [of the system] utilized approximately 400,000 gallons of water over [] 48 hours. The coal was retested and samples were negative for total coliform and E. coli[,]" although "[a]nother coal pile runoff sample was collected and remain[ed] positive."[10] (MDE Investigation Rep., ECF No. 105-27 at 3.) Thus, the facility was shut down on October 13 and 14, 2018 while the coal was cleaned, after which point it was clean enough to be loaded on ships. (Zacker Dep. at 209:13–17, ECF No. 105-4; MDE Investigation Rep., ECF No. 105-27 at 3.) Additionally, during this initial phase, "[a]ll

---

[10] Dr. William Bullock, CSX's Director of Industrial Hygiene in October 2018 (Bullock Dep. at 8:5–7, ECF No. 105-40), explained that they waited for the total coliform level from the coal runoff samples to test below 200 (from a starting point of above 5,000) for two days in a row, at which point they "felt confident that . . . the bacteria had . . . either died or, you know, purged." (Bullock Dep. at 52:13–54:9, ECF No. 103-19; *see also* Bullock Rep., ECF No. 103-20 at 5 ("Satisfactory disinfection of secondary effluent from a waste treatment plant is defined by an average fecal coliform count of <200 fc/100 mL.").) Dr. Bullock clarified that he was only focused on daily samples from coal runoff water to inform "worker health and safety for pier employees," and did not "look at or focus on . . . other sample results that impacted the environmental system or Hepaco, . . . their work that was progressing. (Bullock Dep. at 51:5–9, ECF No. 103-19.) Samples collected from other parts of the filtration system would provide insight into remediation of the system. (*Id.* at 51:17–52:6.)

Sample results from October 17, 2018 revealed levels of total coliform below 200 MPN/100mL—the number Dr. Bullock identified as a safe threshold—in certain parts of the filtration system (including the first two tanks), while other parts of the system (including the third tank and the basin) maintained total coliform levels well above 200 MPN/100mL. (ECF No. 103-26.) When asked about these numbers, Purcell explained that "[t]here's still work to be done. . . . it still looks like they're controlling the water levels in those tanks. . . . they are still putting water into those tanks from the system from the basins." (Purcell Dep. at 209:17–21, ECF No. 120-7.) He continued, "[a]t any time, that level could be different than that." (*Id.* at 209:22–23.)

puddles and standing water were treated with a 10:1 bleach solution." (MDE Investigation Rep., ECF No. 105-27 at 3.)

After the coal was clean, HEPACO continued to disinfect the rest of the system. They "pump[ed] the water out of the ditches and disinfect[ed] all the ditches." (Zacker Dep. at 203:20–21, ECF No. 105-4.) HEPACO had to "disinfect the whole facility and go backwards" through its various components "because everything was impacted from the spray water that ran through the sprayer." (*Id.* at 204:1–204:9.) Because of the residual chlorine limit in its discharge Permit, CSX "c[a]me up with a formulation of the minimum amount of chlorine [it] could use to disinfect the area." (*Id.* at 194:15–19.)

The City granted CSX permission to pump contaminated water back into the City's sewage system at a rate of 13,500 gallons/day, which would need to be decreased if there was major rainwater. (Emails from Ronald McNair, Baltimore City Department of Public Works, ECF No. 105-22; MDE Investigation Rep., ECF No. 105-27 at 3.) This discharge limit extended the remediation process. (*See* Pankey Dec. ¶ 37, ECF No. 120-2 ("The environmental remediation was slowed because the retention basin and three sediment tanks needed to be cleaned and drained of approximately 4 million gallons of water, and HEPACO was only permitted to discharge 13,500 gallons per day into the City of Baltimore's sanitary sewer."); Purcell Dep. at 155:18–21, ECF No. 105-28 ("[T]he volume was also at play, too, the amount that gets discharged [into the sewer]. So you had a lot of storage on site that they could only discharge a certain amount per day.").) Additionally, HEPACO had to monitor water levels on site and manage pumps to ensure that the 13,500 gallon limit was not exceeded or that the basin did not overflow and "keep[] the water on site in the containment zones, in the ponds, wherever they were controlling that water." (Purcell Dep. at 155:24–156:5, 156:21–157:9, ECF No. 105-28.)

17

HEPACO worked on site twenty-four hours a day, seven days a week. (*See id.* at 1–7.) Purcell testified that, depending on the project, this would be standard in the industry "if it's something that requires full-time or an expedited cleanup" because "it's more about getting it done fast than it is about saving time or money. It's getting everything back into operation and getting it all done so we can operate as normal." (*Id.* at 160:2–18.)

Purcell acknowledged that he was not provided with test samples, or "clearance testing," to indicate the level of contamination in the system after HEPACO had completed its work. (Purcell Dep. at 273:1–8, ECF No. 120-7.) Purcell acknowledged that analytical data would be helpful, but that "we can only assume that the contamination process they did . . . was successful based on the procedures they went through. And it was meticulous and it was . . . definitely a long, drawn out process." (*Id.* at 274:4–274:14, ECF No. 120-7.)

CSX invoiced the City in the amount of $1,918,611.62 related to the environmental remediation for the costs it paid to contractors. (Zacker Dec. ¶¶ 13–15, ECF No. 105-30; *see also* ECF Nos. 150-30–150-39 (attaching invoice submitted to City and invoices and receipts CSX paid for HEPACO and other contractors' work).)

CSX filed suit against the City and Spiniello on October 10, 2019. (*See generally* Compl., ECF No. 1.) The Court will provide additional factual and procedural details as relevant to the pending Motions discussed below.

## II.    Discussion

### A.    Motions to Dismiss

Defendants have filed four Motions to Dismiss for various evidentiary and discovery-related issues. They do not seek less harsh remedies more narrowly tailored to the alleged misconduct underlying these Motions. "Mindful of the strong policy that cases be decided on the

merits, and that dismissal without deciding the merits is the most extreme sanction, a court must . . . only exercise its inherent power to dismiss with restraint[.]" *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 462 (4th Cir. 1993). Defendants have failed to justify such an extreme sanction, and the Motions will be denied.

### *1. Spoliation*

Defendants first move to dismiss this action for the purported spoliation of two pieces of potential evidence: (1) data from the Supervisory Control and Data Acquisition ("SCADA") system ("SCADA data") (ECF No. 90); and (2) communications to coal owners in the aftermath of the incident. (ECF No. 93.) These Motions will be denied.

#### *a. Legal Standard*

"Spoliation occurs when a party destroys or materially alters evidence or fails to preserve property that could be used as evidence in a pending or reasonably foreseeable case." *Jennings v. Frostburg State Univ.*, Civ. No. ELH-21-656, 2023 WL 4564577, at *8 (D. Md. June 27, 2023) (citing *Boone v. Everett*, 751 F. App'x 400, 401 (4th Cir. 2019) (per curiam)).

As a preliminary matter, as will be explained below, the evidence underlying both spoliation Motions is electronically stored information ("ESI").[11] This distinction is important because Federal Rule of Civil Procedure 37(e) governs sanctions for the failure to preserve ESI and "forecloses reliance on inherent authority or state law to determine when certain measures should be used." Fed. R. Civ. P. 37, Advisory Comm. Notes; *see also Fowler v. Tenth Planet,*

---

[11] "Electronically stored information may exist in dynamic databases and other forms far different from fixed expression on paper." Fed. R. Civ. P. 34, Advisory Comm. Notes. "Digital or electronic information can be stored in any of the following: mainframe computers, network servers, personal computers, hand-held devices, automobiles, or household appliances; or it can be accessible via the Internet, from private networks, or from third parties." Herr, Ann. Manual Complex Lit. § 11.446 (4th ed.).

*Inc.*, Civ. No. 1:21-02430-JRR, 2023 WL 3569816, at \*7 (D. Md. May 19, 2023) (explaining that "the amended version of Rule 37(e) significantly limits a court's discretion to impose sanctions for the loss or destruction of ESI[.]" (quotations omitted)).  Therefore, the parties' reliance on *Silvestri v. General Motors Corporation*, 271 F.3d 583 (4th Cir. 2001), which related to a court's inherent authority to impose sanctions for spoliation of evidence, is misplaced.[12]  (*See* ECF Nos. 90 at 5–6, 115 at 2.)

Rule 37(e) provides:

If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:

(1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or

(2) *only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation* may:

(A) presume that the lost information was unfavorable to the party;

(B) instruct the jury that it may or must presume the information was unfavorable to the party; or

(C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e) (emphasis added).  Thus, "in order to obtain sanctions for the spoliation of ESI, the moving party must satisfy four threshold elements: '(1) ESI should have been preserved; (2) ESI was lost; (3) the loss was due to a party's failure to take reasonable steps to preserve the ESI; and (4) the ESI cannot be restored or replaced through additional discovery.'" *Jennings*, 2023

---

[12] Defendants also cite a "five-factor test for determining appropriate sanctions to impose for failure to provide timely discovery," (ECF No. 90 at 6 (citing Fed. R. Civ. P. 37(b)(2) and *Thompson v. U.S. Dep't of Hous. & Urb. Dev.*, 219 F.R.D. 93 (D. Md. 2003))), which is a distinct issue from spoliation and inapplicable here.

WL 4564577, at *8 (quoting *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 327 F.R.D. 96, 104 (E.D. Va. 2018)). Importantly, even assuming the ESI meets the threshold requirements, dismissal is only authorized if the court finds that "the party acted with the intent to deprive another party of the information's use in the litigation." Fed. R. Civ. P. 37(e)(2); *see also Jennings*, 2023 WL 4564577, at *35 ("In order to impose sanctions for spoliation with respect to ESI, there is a heightened standard of culpability."). "[T]he burden is on the moving party to 'demonstrate that the failure to preserve was motivated by an intent to deprive the moving party of the use of the information in the litigation.'" *Id.* at *36 (quoting *Fowler*, 2023 WL 3569816, at *6). Defendants have failed to meet this burden.[13]

### b.  SCADA Data

As CSX explains, "SCADA is a system that tracks the operation of different components of the filtration system." (ECF No. 115 at 5 n.6.) According to the filtration system's Operations & Maintenance Manual, SCADA is a "PC based system" that helps "minimize the need for full-time operator attendance[.]" (ECF No. 90-1 at 2, 11.) SCADA generates daily reports with data on various indicators, such as the running of pumps and any overflows. (*Id.* at 15.) As one of Spiniello's proffered experts explained, SCADA data would help "understand how water made it through the system, what valves were open, how long it sat in each tank, which way it was going, [and whether] they [were] using city potable water in addition to the water they were treating[.]" (Jacobson Dep. at 17:21–18:6, ECF No. 90-13.)

---

[13] The Motions would still fail under the framework outlined in *Silvestri*. Under court's inherent authority to impose sanctions for spoliation, "dismissal is severe and constitutes the ultimate sanction for spoliation. It is usually justified only in circumstances of bad faith or other 'like action.'" *Silvestri*, 271 F.3d at 593 (quoting *Cole v. Keller Indus., Inc.*, 132 F.3d 1044, 1047 (4th Cir.1998)). Defendants have not shown conduct on the part of CSX that "was so egregious as to amount to a forfeiture of [its] claim" or "that the effect of the spoliator's conduct was so prejudicial that it substantially denied the defendant the ability to defend the claim" in order to justify dismissal. *Id.*

SCADA data is ESI. *See, e.g., Good v. Am. Water Works Co.*, Civ. No. A. 2:14-1374, 2015 WL 1757978, at *1, *4–*5 (S.D.W. Va. Apr. 17, 2015) (applying discovery rules related to production of ESI to SCADA data). CSX represents that "[i]n 2018, the SCADA data was overwritten in the normal course after it was not manually saved within 30 days[.]" (ECF No. 115 at 8; *see also* Operations & Maintenance Manual, ECF 90-1 at 11, 15 (noting the report data is saved in the remote terminal unit ("RTU") for 31 days); Shaw Dep. at 51:4–8, ECF No. 90-15 (explaining that "SCADA looks at a finite window. . . . Once the information falls outside of that window of time, it then proceeds to a database. And that database manages and stores that data for another period of time").)

The Court need not consider whether the threshold requirements of Rule 37(e) are met, because Defendants have wholly failed to establish that CSX "acted with the intent to deprive" them of the SCADA data for use in this litigation. Fed. R. Civ. P. 37(e)(2). The only assertion they make as to CSX's level of culpability is that CSX's conduct "is more than just negligence" and that "[b]y April of 2021, CSX clearly knew this data was important to Spiniello and yet is still failed to produce the then-currently available data from the then-current 31 day window and then preserve and produce the data from March of 2021 forward." (ECF No. 141 at 3.)

Without more, the Court cannot find that CSX acted with an intent to deprive Defendants of the SCADA data. First, there is no indication that CSX acted with the requisite heightened culpability in failing to preserve SCADA data from 2018, when the events underlying this lawsuit took place. Second, as to later data, "more than negligence" does not satisfy Defendant's burden of showing CSX acted with an intent to deprive them of the information. Defendants rely on emails in which Spiniello requested data from other time periods in July of 2021. (ECF Nos. 141-1 (July 9, 2021 email requesting "[a]ny SCADA records (noting you indicated CSX cannot locate

22

SCADA records from 2017 or 2018, but that any SCADA records from 2016, 2019, etc. will still be helpful)"); 141-2 (July 29, 2021 email following up to request "any [SCADA] records you do have, even if they post-date the incident).) Defendants do not give the Court enough upon which to make a finding of heightened culpability.

Additionally, Defendants complain of the fact that CSX represented during discovery that the SCADA data could not be found, but did not disclose at that time that the records had been deleted. (ECF No. 141 at 1–2.) Defendants explain that this deprived them of the opportunity to "explore[] the details of the deletion during depositions or retain[] appropriate technology experts to ascertain whether it could be retrieved." (*Id.* at 2.) This concern highlights the importance of promptly raising spoliation issues when they arise. As one court in this District has explained:

> The lesson to be learned from the cases that have sought to define when a spoliation motion should be filed in order to be timely is that there is a particular need for these motions to be filed as soon as reasonably possible after discovery of the facts that underlie the motion. This is because resolution of spoliation motions are fact intensive, requiring the court to assess when the duty to preserve commenced, whether the party accused of spoliation properly complied with its preservation duty, the degree of culpability involved, the relevance of the lost evidence to the case, and the concomitant prejudice to the party that was deprived of access to the evidence because it was not preserved. . . . The least disruptive time to undertake this is during the discovery phase, not after it has closed.

*Goodman v. Praxair Servs., Inc.*, 632 F. Supp. 2d 494, 508 (D. Md. 2009).

As the emails cited above reflect, Spiniello was aware of this issue as of the summer of 2021, (ECF Nos. 141-1, 141-2), at which point the parties were in the midst of discovery. Yet, Defendants did not file the instant Motion until January of 2023, along with a slew of other Motions—several of which also sought the harsh remedy of dismissal—as well as Spiniello's Motion for Summary Judgment. This is an issue that could have been sorted out during the discovery phase, rather than raised as grounds for dismissal more than a year after fact discovery

had closed, and some eighteen months after Spiniello became aware of the issue. The Motion will be denied.

### c. *Communications to Coal Owners*

Defendants also move to dismiss given the spoliation of communications CSX purportedly sent to its customers, the owners of the coal stored at the Facility, in the aftermath of the incident. (ECF No. 93.) Dr. Bullock referred to the need to "communicate to the customer what happened" and that the environmental team, sales and marketing team, and in-house legal counsel put together a "more formal . . . communication about [what] went on." (Bullock Tr. at 39:3–10, ECF No. 93-5; *see also* Ross Dep. at 102:2–9, ECF No. 139-1 ("[A]s is likely part of the record, . . . we ultimately had to disclose the incident [to CSX's customers]").) Dr. Bullock later clarified that it was a written communication and that he was "pretty sure that it was [sent by] the vice president of sales and marketing that . . . is the direct liaison between CSX and the customer." (Bullock Tr. at 41:2–11, ECF No. 93-5.)

CSX represents that, in response to discovery requests, "CSX performed an ESI search for responsive documents and custodians, and the alleged communications to coal owners were not captured." (ECF No. 115 at 15–16; *see also* Kennedy Dec. ¶¶ 8–13, ECF No. 115-2 (describing steps CSX took to determine if letters were sent to coal owners, including checking with CSX's in-house counsel and a marketing representative).)

As CSX's description illustrates, this evidence is likewise ESI.[14] Again, the Court need

---

[14] Defendants' characterization of this evidence also makes clear that they understand it to be ESI. (*See* ECF Nos. 93 at 6–7 ("It is hard to believe that there is a not a copy saved in its email system or other servers, but that is what CSX says."); 139 at 3 ("CSX does not produce an affidavit from anyone in its Information Technology Department indicating that it conducted a search of CSX's email or document management system for the relevant time period looking for such emails or letters.").)

24

not conduct a full Rule 37(e) analysis because, fatal to Defendants' Motion, they have not made any showing that CSX failed to preserve the communications with an intent to deprive Defendants of them in this litigation. Further, the late timing of this Motion well after the close of discovery makes it difficult to determine what communications did in fact exist and whether CSX's efforts to find them were adequate. *See Goodman*, 632 F. Supp. 2d at 508. Accordingly, the Motion will be denied.

### 2. *Failure to Disclose Material Evidence*

Defendants also move to dismiss CSX's claims based on CSX's purported failure to disclose or supplement in discovery that it had stopped using chlorine in the system on October 3, 2018. (ECF No. 91.) The Motion will be denied.

As an initial matter, it is unclear what Rule Defendants invoke as the basis for this Motion. In a single string citation, they cite Rule 37(b)(2), (ECF No. 91 at 5), which provides for sanctions for failure to comply with a court order. Defendants have not pointed to a court order relating to the evidence at issue. Elsewhere, the Motion refers to "Federal Rule of Evidence 37," (*id.* at 1), which the Court will presume was intended to be Federal Rule of Civil Procedure 37. No where, however, does the Motion cite specific language in that Rule on which Defendants purport to rely.

Nevertheless, the five-factor test upon which Defendants rely (ECF No. 91 at 5) was originally developed in the context of analyzing whether evidence should be excluded under Rule 37(c)(1). *See Thompson*, 219 F.R.D. at 103 & n.8 (citing *Southern States Rack and Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592 (4th Cir. 2003)). Rule 37(c)(1) provides: "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a

25

trial, unless the failure was substantially justified or is harmless."[15] The Fourth Circuit has explained:

> [I]n exercising its broad discretion to determine whether a nondisclosure of evidence is substantially justified or harmless for purposes of a Rule 37(c)(1) exclusion analysis, a district court should be guided by the following factors: (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.

*Southern States*, 318 F.3d at 597; *see also Wilkins v. Montgomery*, 751 F.3d 214, 222 (4th Cir. 2014) (reiterating district courts' broad discretion to decide harmlessness and noting that courts are "not *required* to tick through each of the *Southern States* factors" (emphasis in original)).

Rule 37(c)(1) also authorizes other sanctions, including, by reference to Fed. R. Civ. P. 37(b)(2)(A)(v), dismissal. *See* Fed. R. Civ. P. 37(c)(1)(C). It is not clear, however, that the *Southern States* factors, which are tailored to the exclusion of evidence, are helpful in deciding whether a further sanction such as dismissal would be appropriate.[16] To the extent they do apply, Defendants have failed to show how the *Southern States* factors support dismissal here. Once again, the Court is mindful of the fact that "[t]he most serious sanctions of dismissal and default

---

[15] Rule 26(a) governs initial disclosures a party must make. Rule 26(e) requires that "[a] party who has made a disclosure under Rule 26(a)—or who has responded to an interrogatory, request for production, or request for admission—must supplement or correct its disclosure or response: (A) in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing; or (B) as ordered by the court."

[16] Notably, *Southern States* distinguished its test from the factors set forth in *Anderson v. Found. for Advancement, Educ. & Emp. of Am. Indians*, 155 F.3d 500 (4th Cir. 1998) when affirming default judgment as a Rule 37(b) sanction. *Southern States*, 318 F.3d at 597. Those factors included the existence of bad faith, resulting prejudice, need for deterrence, and effectiveness of less drastic sanctions. *Id.* (citing *Anderson*, 155 F.3d at 504); *see also, e.g., Rollakanti v. Holy Cross Hosp.*, Civ. No. TJS-22-887, 2022 WL 16951245, at *2 (D. Md. Nov. 15, 2022) (applying *Anderson*'s four-factor test and dismissing case pursuant to Rule 37(b)(2)), *aff'd*, No. 22-2209, 2023 WL 2610254 (4th Cir. Mar. 23, 2023). None of these factors would weigh towards dismissal here.

judgment are reserved for 'the most flagrant case[s], where the party's noncompliance represents bad faith and callous disregard for the authority of the district court and the Rules.'" *Rollakanti*, 2022 WL 16951245, at *2 (quoting *Mut. Fed. Savs. & Loan Ass'n v. Richards & Assocs., Inc.*, 872 F.2d 88, 92 (4th Cir. 1989)).

Most importantly here, Defendants have not identified any prejudice in the form of surprise or inability to cure that surprise (the first two factors). The third and fourth factors do not weigh towards a sanction, as the Court assumes that Defendants would want to use this evidence at trial. As Defendants explain:

> Spiniello never argued that it did not know that CSX was not using chlorine on the date of the incident. Rather, Spiniello argued that because of this substantial change to the System, there is no way to analyze whether, as CSX alleges, that the bacteria present in the System in October and November of 2018 was caused by Spiniello's discharge of contaminated rinse water into the System or was caused by CSX's decision to stop treating the System with the one agent meant to control bacteria.

(ECF No. 138 at 2.) This argument goes directly to merits of CSX's claim, and indeed is a defense Defendants repeat in support of their positions on summary judgment. Thus, Defendants have not articulated any harm stemming from the alleged failure to disclose this information, and certainly not any warranting dismissal. The Motion will be denied.

### 3. Witness Tampering

Spiniello moves for dismissal as a sanction for CSX's alleged witness tampering and obstruction of Reyntjens. (ECF No. 92.) The City does not join this Motion.

"Federal courts have the inherent power to dismiss an action with prejudice as a sanction" for misconduct. *In re Jemsek Clinic, P.A.*, 850 F.3d 150, 158 (4th Cir. 2017). Again, however, "a court must exercise its dismissal power with restraint and 'may do so only after considering several factors[.]'" *Dewitt v. Ritz*, Civ. No. DKC 18-3202, 2021 WL 915146, at *3 (D. Md. Mar. 10,

2021) (quoting *Shaffer Equip.*, 11 F.3d at 462). These factors include the wrongdoer's culpability, the client's (rather than the attorney's) blameworthiness, the prejudice to the judicial process and to the victim, the availability of other sanctions, and the public interest. *Shaffer Equip.*, 11 F.3d at 462–63. "Orders of dismissal are appropriate 'when a party deceives a court or abuses the process at a level that is utterly inconsistent with the orderly administration of justice or undermines the integrity of the process.'" *Projects Mgmt. Co. v. Dyncorp Int'l LLC*, 734 F.3d 366, 373 (4th Cir. 2013) (quoting *Shaffer Equip.*, 11 F.3d at 462).

At bottom, Spiniello's Motion rehashes a discovery dispute. The basis of Spiniello's Motion includes its assertions that CSX was not transparent about its relationship with Reyntjens as a consulting expert and the degree of control it exercised over him; that CSX did not facilitate Spiniello's deposition of him; that CSX's designated Rule 30(b)(6) witness was not able to respond to questions about the Facility's SCADA system, as Spiniello requested; [17] and that CSX provided its experts access to Reyntjens without disclosing to Spiniello that its experts relied on information provided by Reyntjens. (*See generally* ECF No. 92.) In what Spiniello contends is "the most blatant example of witness tampering," (ECF No. 92 at 12), CSX sent a letter to Reyntjens asking him to disregard Spiniello's subpoena. (Nov. 19, 2021 Letter, ECF No. 92-23; *see also* Nov. 18,

---

[17] Federal Rule of Civil Procedure 30(b)(6) provides: "In its notice or subpoena, a party may name as the deponent a public or private corporation, a partnership, an association, a governmental agency, or other entity and must describe with reasonable particularity the matters for examination. The named organization must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on its behalf[.]" "To the extent information sought in a Rule 30(b)(6) deposition is relevant to the claims or defenses in the case and is known or reasonably available to the corporation, it must provide a corporate designee or multiple designees prepared to provide that information" and "'is expected to *create* a witness or witnesses with responsive knowledge[.]'" *Coryn Grp. II, LLC v. O.C. Seacrets, Inc.*, 265 F.R.D. 235, 238 (D. Md. 2010) (emphasis in original) (quoting *Wilson v. Lakner*, 228 F.R.D. 524, 528–29 (D. Md. 2005); *see also id.* at 239–40 (discussing possible sanctions for failure to provide adequately prepared designee, ranging from monetary sanctions to reconvening the deposition at corporation's expense). CSX represents that Spiniello raised no issue with its Rule 30(b)(6) witness until the instant Motion. (ECF No. 144 at 9 n.10.)

28

2021 Objection of CSX to Subpoena, ECF No. 114-4 (noting subpoena was issued after the close

of discovery and requested production of documents beyond the 100 miles permitted by Rule 45).)

The Court need not discuss in detail the full history of discovery related to Reyntjens. As

relevant to the pending Motion, in January 2021, CSX disclosed Reyntjens as a potential fact

witness with knowledge about "the water filtration system at the Facility, the maintenance history

of the water filtration system at the Facility, and the facts and circumstances of incidents involving

Spiniello, and work performed by Spiniello at the Facility[.]"[18]  (CSX Supp. Answers Spiniello's

First Set Interrog., ECF No. 92-3 at 3.)  In April 2021, Zacker stated in a deposition that Reyntjens

oversaw the SCADA system.  (Zacker Dep. at 113:7–21, ECF No. 92-5.)  Thus, Spiniello had

notice of the value of Reyntjens's testimony well before November 2021, when CSX's expert

Shaw stated in his deposition that Reyntjens was "the go-to guy for the dust suppression system[.]"

(Shaw Dep. at 18:6–7, ECF No. 92-33.)

Moreover, as of August of 2021, Spiniello had been in communication with CSX about

scheduling Reyntjens's deposition, (*see* ECF No. 92-16 (emails from August 2–16, 2021 between

counsel for CSX and Spiniello)), and attempted to reach Reyntjens starting in April of 2021.  (*See*

Apr. 16, 2012 Letter, ECF No. 92-7; Aug. 19, 2021 Letter, ECF No. 92-17.)  Yet Spiniello did not

include Reyntjens's deposition in its October 1, 2021 request to extend discovery.  (*See* Joint

Motion to Amend Scheduling Order, ECF No. 62 at 2 (seeking extension of discovery deadline to

complete four specified depositions and noting that "[t]he parties are not seeking to conduct

additional discovery and the extension of the current deadline is only meant to finalize the

---

[18] Unlike witnesses the parties expect to use to present expert testimony, *see* Fed. R. Civ. P. (a)(2)(A), CSX was under no obligation to disclose that it had retained Reyntjens as a consulting expert.

remaining depositions").)

Finally, as to the letter CSX sent to Reyntjens,[19] the Court notes that Spiniello was not acting with clean hands, having issued a subpoena to PCMA, Reyntjens's company, to produce documents on November 4, 2021, (ECF No. 92-19), in violation of the Court's order setting a deadline of November 1, 2021 for fact discovery. (ECF No. 63.)

CSX's conduct nowhere near approaches the type of wrongdoing that would warrant dismissal. *Cf. Dewitt*, 2021 WL 915146, at *8 (dismissing case as litigation sanction where plaintiff relied on an exculpatory police report he had "deliberately fabricated" and perjured testimony that he obtained by bribing multiple witnesses). Spiniello has made no attempt to justify dismissal by application of the five *Shaffer Equipment* factors it cites, including CSX's culpability, the prejudice to the administration of justice, or the availability of other sanctions. (*See* ECF No. 92 at 11–16); *Shaffer Equip.*, 11 F.3d at 462–63. While Spiniello is undoubtably prejudiced by the fact that it apparently has not deposed Reyntjens, that failure is, at least not entirely or even predominantly, attributable to CSX. Accordingly, Spiniello's Motion to Dismiss for Witness Tampering and Obstruction (ECF No. 92) will be denied.

### B. Expert Witnesses

Defendants move to "strike" two of CSX's expert witnesses, John Shaw and Kiernan Purcell, on two grounds: (1) for conducting prohibited and untimely fact discovery, (ECF Nos. 96,

---

[19] Spiniello implies that CSX may have been involved in obstructing Spiniello's access to Reyntjens—who did not respond to Spiniello's earlier attempts to reach him—prior to this letter. (ECF No. 92 at 13 ("Spiniello will never know what CSX was saying to Mr. Reyntjens behind the scenes and whether CSX is [the] reason that Mr. Reyntjens never responded to Spiniello's telephone calls and emails; but, if CSX was so bold to tell a fact witness not to comply with a federal court subpoena in writing, just imagine what lengths CSX would go to behind the scenes.").) This accusation, however, is mere speculation.

97); and (2) as inadmissible under Federal Rule of Evidence 702. (ECF Nos. 95, 100.) The Motion to exclude part of Purcell's testimony (ECF No. 95) will be granted. The Motions will otherwise be denied.

### *1. Alleged Untimely Fact Discovery*

Defendants move to "strike" expert witnesses Shaw and Purcell based on the fact that they interviewed CSX employees and affiliates, and that Purcell conducted a site visit, after the close of fact discovery. (*See* ECF Nos. 96 at 1, 97 at 1.) These Motions are without merit because the Court's discovery deadline applies only to the use of discovery devices for obtaining information from the opposing party or a third party. *See, e.g.*, *Redus v. CSPH, INC.*, Civ. No. 3:15-2364-M, 2017 WL 2079807, at *6 (N.D. Tex. May 15, 2017) ("[T]he term 'discovery' as it is generally used in Federal Rules of Civil Procedure 26 through 37 does not generally include informally investigating facts and issues by contacting potential witnesses who are free to ignore the communication if they elect to do so, as opposed to formal discovery requests that are expressly governed by a Federal Rule and to which a party is legally required to comply."); *Am. Bank v. City of Menasha*, 627 F.3d 261, 265 (7th Cir. 2010), as amended (Dec. 8, 2010) ("The word 'discovery' is not a synonym for investigation. Much of the information gathering that litigants do is not 'discovery' as the term is understood in the law."); *Lumpkin v. Kononov*, Civ. No. 2:12-00320-APR, 2014 WL 4373630, at *2 (N.D. Ind. Sept. 3, 2014) ("The Federal Rules of Civil Procedure do not prohibit [a party] from inspecting [its] own property [outside of discovery].").

Defendants do not contend that CSX's experts, or CSX's counsel on their behalf, engaged in any formal discovery to obtain the information underlying their reports. If this had happened, Defendants could have objected to the discovery request as untimely. *Cf. Sparton Corp. v. United States*, 77 Fed. Cl. 10, 15 (2007) (denying motion to compel production of documents that was

issued "well after the close of fact discovery," because "[a]though [the] documents [sought] may contain factual information upon which expert opinions may be rendered, the documents themselves do not constitute expert discovery.").

A case upon which Defendants rely highlights this distinction. *See Ruiz-Bueno v. Scott*, Civ. No. 2:12-0809, 2014 WL 576400 (S.D. Ohio Feb. 12, 2014). There, the court denied the plaintiff's Rule 34 request to have its expert conduct a site visit after discovery had closed. *Id.* at *5; *see also* Fed. R. Civ. P. 34(a)(2) (governing requests "to permit entry onto designated land or other property possessed or controlled by the responding party[.]"). In so doing, the court recognized that the plaintiff could obtain the information sought through sources "that do not depend on discovery," and that, if the defendants' expert conducted a site visit as expected "and expresses opinions based on that visit, Defendants will be required to disclose not only his opinions but also 'the facts or data' he considered in reaching those opinions and 'any exhibits that will be used to summarize or support them.'" *Ruiz-Bueno*, 2014 WL 576400 at *5. This analysis makes clear that the defendant's expert's inspection of the defendant's property did not run afoul of any discovery deadlines. *Id.* Likewise, CSX's expert could conduct a site visit of CSX's property after the discovery deadline.[20]

Nor are the circumstances here akin to *Henry v. Quicken Loans Inc.*, in which the court struck certain evidence the defendants purportedly gathered in support of its expert report but should have been produced in discovery under Rule 26(a), and upon which defendants relied as

---

[20] For this reason too, despite Defendants' contention to the contrary, CSX's argument opposing Defendants' Motion is not inconsistent with its earlier position in opposing Spiniello's request for its experts to conduct a site visit after the close of discovery, (CSX Correspondence re: Discovery Conference, ECF No. 82), because in that case Spiniello was seeking to enter and inspect another party's property.

independent evidence in support of summary judgment. *Henry v. Quicken Loans Inc.*, Civ. No. 04-40346, 2008 WL 4735228, at *6 (E.D. Mich. Oct. 15, 2008). In contrast to *Henry,* Defendants here do not move to strike information that was gathered as part of developing expert reports that should have been produced earlier pursuant to Rule 26(a) or a discovery request—rather, they move to "strike" the experts themselves. The Court sees no basis to do so. Accordingly, Defendants Motions to strike CSX's expert witnesses for conducting untimely fact discovery, (ECF Nos. 96, 97), will be denied.

### 2. *Admissibility of Expert Opinions*

Defendants further argue that Shaw and Purcell's opinions, at least in part, are inadmissible under Federal Rule of Evidence 702 and Maryland Rule of Evidence 5-702. The Court will evaluate these Motions under Federal Rule of Evidence 702. *See Donalds v. Ethicon, Inc.*, No. 22-1737, 2023 WL 2446703, at *3 (4th Cir. Mar. 10, 2023) ("[T]he admissibility of expert testimony in federal court sitting in the diversity jurisdiction is controlled by federal law." (quoting *Bryte ex rel. Bryte v. Am. Household, Inc.*, 429 F.3d 469, 476 (4th Cir. 2005))). For the reasons stated below, the Motion as to Shaw (ECF No. 100) will be denied and the Motion as to Purcell (ECF No. 95) will be granted.

### a. *Legal Standard*

Federal Rule of Evidence 702 allows a witness "who is qualified as an expert by knowledge, skill, experience, training, or education" to "testify in the form of an opinion or otherwise" if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

A district court's role is to ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). "This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592–93. This basic gatekeeping obligation applies to all expert testimony, not just scientific testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).

To be relevant, or helpful, an expert opinion must have a valid connection to the pertinent inquiry. *Belville v. Ford Motor Co.*, 919 F.3d 224, 232 (4th Cir. 2019). To be reliable, an "expert opinion must be based on scientific, technical, or other specialized knowledge and not on belief or speculation, and inferences must be derived using scientific or other valid methods." *Oglesby v. General Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999). A district court enjoys wide latitude in determining what indicia of reliability are most relevant in a given case. *Nease v. Ford Motor Co.*, 848 F.3d 219, 229 (4th Cir. 2017). Those indicia may include:

> (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether a technique has a high known or potential rate of error and whether there are standards controlling its application; and (4) whether the theory or technique enjoys general acceptance within the relevant community.

*Fireman's Fund Ins. Co. v. Tecumseh Prods. Co.*, 767 F. Supp. 2d 549, 553 (D. Md. 2011) (quoting *Kumho Tire*, 526 U.S. at 149–50). Further, "no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience." *Kumho Tire Co.*, 526 U.S. at 156. "However, '[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is

a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'" *JFJ Toys, Inc. v. Sears Holdings Corp.*, 237 F. Supp. 3d 311, 322 (D. Md. 2017) (quoting Fed. R. Evid. 702, Advisory Comm. Notes).

"Where the admissibility of expert testimony is specifically questioned, Rule 702 and *Daubert* require that the district court make explicit findings, whether by written opinion or orally on the record, as to the challenged preconditions to admissibility." *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 283 (4th Cir. 2021). The party seeking admission of the expert testimony bears the burden of establishing admissibility by a preponderance of the evidence. *Higginbotham v. KCS Intern.*, 85 F. App'x. 911, 915 (2004) (citing *Daubert*, 509 U.S. at 592 n.10).

### b.  John Shaw

CSX engaged Shaw to evaluate CSX's response after observing a Spiniello employee discharge raw sewage into the system. (ECF No. 119 at 7.) Shaw concluded "that the response by CSX and its consultants to the realization that Spiniello had been illegally discharging an unknown amount of material of unknown origins into the dust suppression system at the Site was responsible, prudent, well considered and effective." (Shaw Rep., ECF No. 100-1 at 5.) More specifically, he concluded, "[b]ased upon eyewitness accounts, inspection reports, lab results, deposition testimony, photographs, and documents produced, it was reasonable for CSX to assume the illegal discharge by Spiniello . . . [h]ad been ongoing for an unknow[n] period of time, but most likely in excess of two weeks" and "[w]as present on every surface under the influence of the dust suppression system." (*Id.* at 14–15.) To reach this conclusion, Shaw reviewed various documents, including inspection reports and daily work logs, system maps, incident reports, and correspondences, as well as deposition transcripts, and interviewed CSX and HEPACO employees. (*Id.* at 4–5.)

Defendants challenge Shaw's qualifications, the sufficiency of the data on which he relied in rendering his opinions, and the reliability of his method. For the reasons explained below, none of these attacks have merit, and Defendants' Motion will be denied.

First, although they do not explicitly say so, Defendants seem to argue that Shaw is not qualified, given that "he has never responded to an environmental spill or contamination event like this before." (ECF No. 100 at 6.) The Court finds that Shaw is qualified. He is a registered civil engineer with more than thirty years of experience working in water and wastewater utility consulting, operations, management, and maintenance. (Shaw Rep., ECF No. 100-1 at 3.) He has held engineering licenses in more than twenty-five states, including Maryland, and has certifications in the operation of water treatment plants and wastewater treatment plants. (Shaw Curriculum Vitae, ECF No. 119-3 at 3–4.)

The fact that Shaw has not responded to a similar incident—which both Shaw and one of Spiniello's experts, Michael Jacobson, described as unusual circumstances (*see* Shaw Dep. at 108:6–11, ECF No. 100-2; Jacobson Dep. at 72:10–73:10, ECF No. 119-5)—does not undermine his otherwise relevant expertise. "The fit between an expert's specialized knowledge and experience and the issues before the court need not be exact." *Am. Strategic Ins. Corp. v. Scope Servs., Inc.*, Civ. No. PX-15-2045, 2017 WL 4098722, at *3 (D. Md. Sept. 15, 2017). Shaw's relevant expertise qualifies him to testify about the operation of water treatment facilities, even if he has not faced this exact situation in the past.

Second, Defendants challenge the sufficiency of the facts and data on which Shaw bases his opinions. Specifically, that he was provided with lab reports that "showed initial positive reports of contamination, but was not provided the reports . . . from just a few days later that showed that most of the contamination had died or purged." (ECF No. 100 at 6.) However,

36

"'questions regarding the factual underpinnings of the [expert witness'] opinion affect the weight and credibility' of the witness' assessment, 'not its admissibility.'" *Bresler v. Wilmington Tr. Co.*, 855 F.3d 178, 195 (4th Cir. 2017)); *see also Burns v. Anderson*, 123 F. App'x 543, 549 (4th Cir. 2004) (holding expert testimony was properly admitted because claims that expert "failed to review certain documents which would purportedly influence" his opinion and relied on "unreliable data" went to "the proper weight to afford [the expert's] testimony, not its admissibility"). Therefore, Defendants effort to challenge Shaw's opinions on the basis of the sufficiency of the data on which he relied fails.

Finally, Defendants challenge the admissibility of Shaw's testimony on the basis that it lacks a reliable methodology and amounts to no more than a "because I say so" explanation given the fact that he "could not opine to a reasonable degree of scientific certainty that the incident did in fact contaminate the entire System and the piles of coal within its vicinity," but only that "it was 'reasonable for CSX to assume' that the entire System was contaminated." (ECF No. 100 at 6–7.)

Defendants' argument misses the point. Shaw is not opining as to whether or not the entire system was contaminated. Rather, he is evaluating the reasonableness of CSX's actions, at that time, to assume the entire system was contaminated and respond accordingly. And Shaw's conclusion that this assumption was reasonable is not based on mere speculation—rather, it is based on Shaw's knowledge of industrial wastewater treatment plants, his review of the analytical data, and of accounts of the facts that were uncovered in the immediate aftermath of the October 12, 2018 discovery. He explained how he reached that conclusion based on sampling data, reports from on-site employees, and the lack of alternatives to determine the extent of the contamination. (Shaw Rep., ECF No. 100-1 at 12–13.) Shaw also explains why this event was extraordinary and why, as the operator of an industrial wastewater treatment plant, he would take it seriously. (*See*

37

Shaw Dep. at 108:6–18, ECF No. 100-2 ("This is very different. This is . . . not contemplated in any regulatory realm . . . it would have been one thing had this occurred at a site where the dust suppression system was simply a treatment plant that then discharged. But . . . that's not what this is. This is a treatment plant that aerosolizes its product into the environment. So the threat level is, in my opinion, so much higher, because it's no longer limited to just the ground or a surface[.]").) Shaw's explanations as to how he reached his conclusions bear sufficient indicia of reliability.

Overall, the Court finds that Shaw's testimony, based on his extensive expertise and review of the facts in this case, is sufficiently reliable. Accordingly, Shaw's testimony is admissible under Rule 702, and the Motion will be denied.

### c. *Kiernan Purcell*

CSX retained Kiernan Purcell of Rimkus Consulting Group, Inc. ("Rimkus") "to evaluate the environmental costs for cleanup/decontamination activities due to raw sewage discharge into the stormwater collection, treatment, and dust suppression system[.]" (Purcell Rep., ECF No. 95-1 at 4.) Purcell, Director of Rimkus's Environmental Practice, concluded, inter alia, that the "[c]laimed cleanup/decontamination costs total[ing] $1,918,611.62" are "reasonable and appropriate."[21] (*Id.* at 5.) To reach this conclusion, Purcell reviewed the underlying invoices, the bulk of which (amounting to $1,824,722.25) were from HEPACO. (*Id.* at 11.) Purcell's analysis of HEPACO's costs was based on daily invoices and daily form packets, which are essentially "a field log of activities" that detail the type of work being done on "an hour by hour basis[.]" (Purcell Dep. at 66:13–17, 67:14–18, ECF No. 95-2.)

---

[21] Defendants do not challenge the other opinions that Purcell expressed in his report, such as that the decontamination response complied with standard industry practices, (Purcell Rep., ECF No. 95-1 at 4–5; *see generally* ECF No. 95), and this Memorandum does not address those opinions.

Defendants do not contend that Purcell, an environmental engineer with experience evaluating contaminated properties, (ECF No. 95-1 at 20), lacks technical knowledge. Rather, they argue that his opinion relating to the alleged damages lacks a sufficient factual basis and that he did not employ a reliable methodology, or a "sound reasoning process," because he "did not bother to actually review, evaluate or analyze the various charges throughout the 1000+ pages of alleged damages." (ECF No. 95 at 20.) As evidence of this deficiency, Defendants point to the fact that Susan Ferrel, a geologist and cost consultant working under Purcell, (*see* Purcell Dep. at 13:12–14, 13:20–21, ECF No. 95-2), reviewed the invoices and input data into a spreadsheet for Purcell to review. (ECF No. 95 at 20.) Defendants also point to several discrete charges, about which Spiniello's attorney questioned Purcell during his deposition, for which "he did not have factual support to opine those costs were reasonable or appropriate." (ECF No. 95 at 21.)

Although Defendants primarily frame this as a lack of sufficient data on which to base his opinions, the Court views it as a reliability problem.[22] Rule 702 is not "intended to suggest that experience alone—or experience in conjunction with other knowledge, skill, training or education—may not provide a sufficient foundation for expert testimony." Fed. R. Evid. 702, Advisory Comm. Notes. And "[e]xperiential testimony need not 'rely on anything like the scientific method.'" *JFJ Toys*, 237 F. Supp. 3d at 322 (quoting *Casey v. Geek Squad Subsidiary Best Buy Stores, L.P.*, 823 F. Supp. 2d 334, 345 n.9 (D. Md. 2011)). However, as stated previously,

---

[22] Although challenging Purcell's lack of a "reliable methodology" in its Motion (ECF No. 95 at 20 (citing *CSX Transp. Inc. v. Miller*, 858 A.2d 1025, 1071 (Md. Ct. Spec. App. 2004)))—albeit citing to Maryland law—Defendants inexplicitly state in their Reply in support of their Motion that "Spiniello did not raise *Daubert* and is not suggesting that Mr. Purcell even used a scientific theory that can or should be evaluated under *Daubert*." (ECF No. 140 at 2.) Spiniello seems to misunderstand *Daubert* and its progeny to apply only to scientific expertise. Nevertheless, because the arguments raised go squarely to the reliability of Purcell's testimony, the Court finds that its gatekeeping duty to ensure the reliability of the testimony is triggered. *See Sardis*, 10 F.4th at 283. Because it finds Purcell's testimony as to the reasonableness of the costs unreliable, it need not address other grounds for exclusion raised in Defendants' Motion.

the witness must still "explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" Fed. R. Evid. 702, Advisory Comm. Notes (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995) ("We've been presented with only the experts' qualifications, their conclusions and their assurances of reliability. Under *Daubert*, that's not enough.")). "A court need not 'admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert [where there is] simply too great an analytical gap between the data and the opinion proffered.'" *Am. Strategic Ins. Corp.*, 2017 WL 4098722, at *4 (quoting *Pugh v. Louisville Ladder, Inc.*, 361 F. App'x. 448, 454 n.4 (4th Cir. 2010)).

Purcell explained in some detail how he, with the assistance of Ferrel, reviewed the invoices and entered data into a spreadsheet to form a "comprehensive analysis." (*See, e.g.*, Purcell Dep. at 61:10–63:7, ECF No. 118-4.) However, when it came to explaining how he reached his conclusion that those costs were reasonable, his report and testimony amounts to nothing more than an *ipse dixit* statement that the costs were appropriate. When asked whether he "create[d] any type of an independent estimate for decontaminating the water filtration system," he answered that he did not. (Purcell Dep. at 72:21–24 ECF No. 95-2.) Similarly, he responded that he did not compare the costs to other possible methods for decontaminating the system. (*Id.* at 35:15–20.) Nor did he cite to other industry standards, practices, or cost comparisons to justify his conclusion. The record before the Court is devoid of any reliable explanation of how Purcell quantified the costs and determined they were reasonable.

As to individual invoices, Purcell testified that he "would go over particularly the invoices, maybe not necessarily on an individual basis, . . . of every item, but go over the general theme with

[Ferell]." (*Id.* at 39:17–20.) Spiniello confronted Purcell with several discrete charges that HEPACO had billed for. For example, when asked why he thought $75 was a reasonable per diem rate, he stated that his opinion was "[j]ust based on experience from other contractors, locations. It's a relatively low number." (*Id.* at 262:1–6.) When further questioned about the lower GSA per diem rate for the applicable area and time period, he testified that "GSA can sometimes be relatively low" and maintained that his "personal opinion from looking at [HEPACO's per diem rate] is it's reasonable" "[j]ust by eye ball test." (*Id.* at 263:1–11, 263:20–24.)[23] Such an explanation does not contain sufficient indicia of reliability to allow it as an expert opinion. And, while many of the challenges to individual line items might go to the weight of Purcell's testimony rather than its admissibility if CSX otherwise established that he employed a reliable method, in a case where the only method he is using is reviewing the invoices and making determinations, his inability to explain why several charges were reasonable and justified casts further doubt on the reliability of his testimony. Thus, on both a macro level in terms of the overall costs, and a micro level in terms of individual charges, he does not explain how his experience in the industry can be reliably applied to the facts to conclude that the costs CSX paid were reasonable and appropriate.

Accordingly, the Court cannot conclude that Purcell's testimony as to the analysis of invoices and amounts charged is reliable, and it will be excluded. This ruling does not implicate other aspects of Purcell's expert report, which have not been challenged.

---

[23] Other purported deficiencies that Defendants identify include: an inconsistency in the total amount Purcell concluded was reasonable, which did not account for $1,601.43 in costs he elsewhere in his report identified as not reasonable, (Purcell Dep. at 11:14–16, ECF No. 95-2); discrepancies in three employees' reported time on a specific date, (*id.* at 258:10–18); a missing daily form packet that made it impossible to verify whether the invoiced charges from that date were appropriate, (*id.* at 202:10–25); and labor costs associated with a separate spill on November 16 for which Spiniello was not responsible. (*Id.* at 232:2–233:11; 234:3–6).

### C. *Scope of Liability and Evidence of Events Before October 12, 2018*

Defendants' Motions *in Limine* raise a central dispute as to the potential scope of Defendants' liability. Defendants move *in limine* to exclude testimony or evidence regarding "other similar incidents" in September and October 2018, arguing that the Complaint only alleges a single negligent incident on October 12, 2018 and, because CSX did not amend its complaint, CSX cannot "piggyback" other alleged negligent acts onto this one.[24]  (ECF No. 99.)  CSX maintains that the Complaint is sufficiently broad to allege a single claim for negligence and breach of contract for ongoing, continuous conduct. (ECF No. 117 at 3, 14–16.) CSX alternatively asks to amend its Complaint to encompass ongoing and continuous negligence before October 12. (*Id.* at 22–24.)  Finally, Defendants seek to exclude hearsay relating to conduct before October 12. (ECF No. 101).  Although the Court agrees with Defendants' interpretation of the Complaint and will deny CSX's request to amend the Complaint, the Motions *in Limine* will be denied.

### *1. Interpretation of Complaint*

The Court first addresses the parties' disagreement about the scope of the Complaint, a central issue that will implicate its analysis of the pending Motions for Summary Judgment. The Court concludes that the Complaint cannot fairly be read to encompass ongoing conduct prior to October 12, 2018. The Complaint specifically defines the "Second Incident" in relation to October 12. (*See* Compl. ¶ 31, ECF No. 1 ("On October 12, 2018, Spiniello, acting on behalf of the City, was caught improperly dumping and/or disposing of raw sewage into a drain that feeds into the water filtration system at the Facility (the 'Second Incident').").)  The Court takes CSX's point

---

[24] Defendants argue prior incidents are barred by the statute of limitations. However, the immediate issue is not so much with the statute of limitations, but rather, as will be discussed below, with fair notice provided in the Complaint.

42

that the use of the word "caught" does not necessarily foreclose alleged negligent conduct occurring prior to and up until when Spiniello was caught. (*See* ECF No. 117 at 20.) However, the Complaint provides no detail to place limits on such an expansive meaning of the term "caught." While the Complaint alleges that the Right of Entry Agreement with the City was formed on July 28, 2014, it does not allege *when Spiniello* started working at the Facility. (*See* Compl. ¶¶ 28, 23.) Nor does the Complaint provide factual content that the alleged misconduct had been ongoing and stopped that day. If "caught" is read in the way CSX advances, the Complaint is too vague to determine when Spiniello's misconduct allegedly began, and the Court is left with no other date, except October 12, 2018, for when the alleged misconduct started.

Nor does the Complaint allege any facts that would give notice as to the scope of the misconduct it alleges, if broader than the October 12 discharge, or any other ways in which CSX claims Spiniello was negligent. More general references to "the worked performed on the sewer lines" and Spiniello's breach of its duty of care in the charged counts, (*see id.* ¶¶ 68, 94–95), do not fill in these missing factual allegations with sufficient specificity. On the whole, CSX did not plead its case in a way that gives fair notice of the theory it now advances. *See Salmon v. Cable & Wireless USA, Inc.*, Civ. No. AW-01-394, 2003 WL 1730413, at *3 (D. Md. Mar. 18, 2003) ("The focus of the notice afforded the defendant [by the complaint] is on the factual, not the legal, basis of the plaintiff's claim. Notice of the underlying facts is sufficient if the complaint sets forth the circumstances, occurrences, and events which, if proven, would entitle the claimant to the relief sought."). Accordingly, CSX will only be allowed to seek liability for Spiniello's negligence (and the City's related contractual breaches) that occurred on October 12, 2018.

### 2. *Amendment of Complaint*

CSX alternatively asks the Court to allow it to amend its Complaint. CSX cites to Rule

15(a)(1), which provides that—except for in circumstances not applicable here—"a party may

amend its pleading only with the opposing party's written consent or the court's leave. The court

should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). However, CSX does

not cite to Rule 16(b)(4), which provides that, once a scheduling order has been entered in a case,

"[a] schedule may be modified only for good cause and with the judge's consent." Fed. R. Civ. P.

16(b)(4). As the Fourth Circuit has explained:

> Rule 15(a)(2) articulates a relatively liberal amendment policy, in which leave to
> amend should be "freely give[n] when justice so requires." That rule applies,
> however, prior to the entry of a scheduling order, at which point, under Rule
> 16(b)(4), a party must first demonstrate "good cause" to modify the scheduling
> order deadlines, before also satisfying the Rule 15(a)(2) standard for amendment.

*Cook v. Howard*, 484 F. App'x 805, 814–15 (4th Cir. 2012) (citing *Nourison Rug Corp. v.*

*Parvizian*, 535 F.3d 295, 298–99 (4th Cir.2008)).[25] "'Good cause' requires 'the party seeking

relief [to] show that the deadlines cannot reasonably be met despite the party's diligence,' and

whatever other factors are also considered, 'the good-cause standard will not be satisfied if the

[district] court concludes that the party seeking relief (or that party's attorney) has not acted

diligently in compliance with the schedule.'" *Id.* at 815 (quoting 6A C. Wright, A. Miller & M.

Kane, *Federal Practice & Procedure: Civil* § 1522.2 (3d ed. 2010)). The Court's scheduling order

set a deadline of July 23, 2020 for amendment of pleadings. (ECF No. 25.)

---

[25] CSX cites *People for Ethical Treatment of Animals v. Doughney* for the proposition that "[t]he Federal Rules allow
liberal amendment of pleadings throughout the progress of a case." 263 F.3d 359, 367 (4th Cir. 2001) (quotation
omitted). In that case, the district court granted summary judgment for the plaintiff on a claim that it had not pled and
"raised . . . for the first time in its summary judgment briefs." *Id.* The Fourth Circuit affirmed, noting that
"[e]ven without a formal amendment, a district court may amend the pleadings merely by entering findings on the
unpleaded issues." *Id.* (quotation omitted). Notably, however, this case was decided before the Fourth Circuit
"directly spoke[] to," for the first time in 2008, "the conflict between [Rule 15(a) and Rule 16(b)] in a published
opinion." *See Nourison Rug Corp.*, 535 F.3d at 298. There, the Fourth Circuit held that "after the deadlines provided
by a scheduling order have passed, the good cause standard must be satisfied to justify leave to amend the pleadings."
*Id.*

Having failed to address Rule 16(b), CSX makes no attempt to show good cause for this late amendment, nor could it. It was a CSX employee who spoke to Mendez on October 12, 2018, and reportedly was told "that was their standard things that they had been doing lately[.]" (Preston Dep. at 34:2–6, ECF No. 105-17.) CSX had reason for concern that it was not a one-time incident from the very beginning. (*See* Pankey Dep. at 91:17–92:1, ECF No. 105-6 (describing her concern when she found out about the discharge on October 12 that "the [Spiniello] employee said, 'Well, this is where we always empty it[,]'" and noting that "[i]t was [her] understanding Spiniello had been on site for several weeks at that point"); Pankey Dec. ¶ 32, ECF No. 120-2 (recounting that she "observed Spiniello's contaminated equipment laying around the Facility without any precautions taken to prevent the spread of contamination").) Further, although CSX argues that "discovery *from Defendants* indicate this issue was (at least) on the City's mind and part of its investigation into CSX's claims," (ECF No. 117 at 23 (emphasis in original)), CSX does not explain why it did not attempt to amend its Complaint during the discovery phase, prior to the deadline for amendments. CSX has not justified an amendment at this late phase in litigation, and its request to amend the Complaint will be denied.

### 3. *Exclusion of Evidence Related to Events Prior to October 12, 2018*

Despite the circumscribed scope of Spiniello and the City's potential liability as described above, evidence of negligence occurring before October 12, 2018 is still relevant and may be admitted at trial for certain purposes. For one, it goes to showing an absence of mistake, and makes it more likely than without the evidence that Spiniello discharged contaminated wastewater into the drainage ditch, as alleged. Although Spiniello has admitted the fact that its employee did discharge some amount of contaminated water on October 12, 2018, Spiniello and the City have maintained that only 50–100 gallons of water were discharged into the ditch and that it was a one-

time, inadvertent act. However, Mendez's statements—reinforced by other examples of poor sanitation practices—could be interpreted to mean that, as to that vac truck in that position on October 12, the discharge started before his shift and was significantly more than 50–100 gallons. Accordingly, the *Motion in Limine* (ECF No. 99) will be denied.

### 4. Hearsay

Finally, Defendants move *in limine* (ECF No. 101) to exclude multiple layers of hearsay statements contained in the October 12, 2018 Inspector's Daily Report, authored by Fazio, (ECF No. 101-6) and an October 15, 2018 email from Mohammed Rahman[26] summarizing the City's investigation, (ECF No. 101-8) both of which make reference to Spiniello having discharged in the ditch for two or three weeks. CSX has responded with various theories of admissibility, including that the challenged out of court statements are admissions of a party opponent under Federal Rule of Evidence 801(d)(2)(D) and that they would be offered not for the truth of the matter asserted, but rather to show CSX's belief at the time as to the scope of the discharge. (ECF No. 116 at 4–9.) The Court does not rely on these documents in reaching its ruling on the pending Motions for Summary Judgment, and their relevance may shift in light of the Court's rulings herein and as issues for trial crystalize. Accordingly, the Motion will be denied without prejudice, subject to reconsideration on motion by Defendants before or at trial.

### D. Adverse Inference from Mendez's Fifth Amendment Invocation

CSX moves to permit an adverse inference from Mendez's invocation of his Fifth Amendment right in response to numerous questions throughout his deposition. (ECF No. 102.)

---

[26] Rahman was an Engineer for the City. (Oct. 15, 2018 Email, ECF No. 101-8 at 3 (Rahman's signature block); Cornish Dep. at 35:17-21, ECF No. 116-1.)

46

"[T]he Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them." *United States v. Mallory*, 988 F.3d 730, 740 (4th Cir. 2021) (quoting *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976)). Judge Copperthite previously denied CSX's Motion to Compel Mendez's testimony, noting that Mendez had properly invoked his Fifth Amendment privilege and that the judge presiding over the trial in this case could consider whether an adverse inference was warranted. (ECF No. 71.) The Court determines that CSX's request is premature. The relevance of an adverse inference that could be drawn from several of the questions Mendez declined to answer is likely diminished based on the Court's ruling as to the scope of Defendants' liability for events before October 12, 2018. Further, while the Court can draw adverse inferences at the summary judgment phase, *see Tfti Corp. v. Williams*, Civ. No. DKC-13-1809, 2016 WL 470865, at *4 (D. Md. Feb. 8, 2016), it need not do so here. Even without an adverse inference from Mendez's silence, factual issues preclude summary judgment in favor of Spiniello. As to CSX's Motion for Summary Judgment against the City, such inferences would be inappropriate, as the evidence must be viewed in the light most favorable to the non-moving party, the City. *See Scott v. Harris*, 550 U.S. 372, 378 (2007). Nor would these inferences overcome the genuine factual disputes.

Accordingly, the Motion will be denied without prejudice. CSX will be permitted to re-raise the issue in advance of trial to determine what, if any, jury instructions on an adverse inference are appropriate.

### E. Summary Judgment

#### 1. Legal Standard

A party seeking summary judgment must show "that there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The

burden is on the moving party to demonstrate the absence of any genuine dispute of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). If a party carries this burden, then the court will award summary judgment unless the opposing party can identify specific facts, beyond the allegations or denials in the pleadings, that show a genuine issue for trial. Fed. R. Civ. P. 56(e). If sufficient evidence exists for a reasonable jury to render a verdict in favor of the party opposing the motion, then a genuine dispute of material fact is presented, and summary judgment should be denied. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The "mere existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to defeat a motion for summary judgment. *Id.* at 252. To carry these respective burdens, each party must support its assertions by citing specific evidence from the record. Fed. R. Civ. P. 56(c)(1)(A). The court will assess the merits of a summary judgment motion, and any responses, by viewing all facts and making reasonable inferences in the light most favorable to the party opposing the motion. *Scott*, 550 U.S. at 378; *see also Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008).

### 2. *Spiniello's Motion for Summary Judgment*

#### a. *Count IX: Negligence*

To sustain a claim for negligence under Maryland law, the plaintiff must prove: "(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the defendant's breach of the duty proximately caused the loss or injury suffered by the plaintiff, and (4) that the plaintiff suffered actual loss or injury." *Troxel v. Iguana Cantina, LLC*, 29 A.3d 1038, 1049 (Md. Ct. Spec. App. 2011).

##### i. *Existence of Legal Duty*

Spiniello first contends that CSX's negligence cannot survive as a matter of law because Spiniello owed CSX no legal duty. "[T]he existence of a legal duty is a question of law to be

48

decided by the court." *Id.* (quoting *Corinaldi v. Columbia Courtyard, Inc.*, 873 A.2d 483, 489 (Md. Ct. Spec. App. 2005)). In a negligence claim, "duty" is defined as "an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another." *Todd v. Mass Transit Admin.*, 816 A.2d 930, 933–34 (Md. 2003) (quoting *Muthukumarana v. Montgomery Cnty.*, 805 A.2d 372, 395 (Md. 2002)). "Although '[t]here is no set formula for this determination,' whether a duty is owed to a particular plaintiff turns on the 'essential question—whether the plaintiff's interests are entitled to legal protection against the defendant's conduct.'" *Cash & Carry Am., Inc. v. Roof Sols., Inc.*, 117 A.3d 52, 58 (Md. Ct. Spec. App. 2015) (citation omitted) (quoting *Ashburn v. Anne Arundel Cnty.*, 510 A.2d 1078, 1083 (Md. 1986) and *Prosser and Keeton on the Law of Torts*, § 53, at 357 (5th ed. 1984)). "[C]entral to the question whether a duty of care in tort should be recognized is the relationship between the parties and the *nature of the risk of harm* created by the defendant's conduct—not the harm that actually materialized." *Id.* at 61 (emphasis in original).

Spiniello argues that CSX cannot recover in tort because the dispute "is controlled by a contract between CSX and Baltimore City" in which "CSX granted Baltimore City and its contractors like Spiniello to enter the Facility and to clean the underground pipe facilities," and the Agreement "provided the City an opportunity to remediate any damages to CSX's property and provided CSX with legal remedies if the Agreement was breached." (ECF No. 103-1 at 15.) Thus, Spiniello maintains that it did now owe CSX a tort duty of care. (*Id.* at 16–17.) Indeed, the negligent breach of one's contractual duty does not, without more, expose one to liability in tort. *Jacques v. First Nat'l Bank of Md.*, 515 A.2d 756, 757 (Md. 1986). However, when an independent duty accompanies a contractual obligation, that independent duty may support a tort claim. *Lawyers Title Ins. Corp. v. Rex Title Corp.*, 282 F.3d 292, 294 (4th Cir. 2002) (citing *Jones v.*

*Hyatt Ins. Agency, Inc.*, 741 A.2d 1099, 1107 (1999)).

Here, the relationship between the parties and the nature of the risk of harm give rise to a duty of care independent of any contractual obligations. *See Pac. Indem. Co. v. Whaley*, 560 F. Supp. 2d 425, 430 n.6 (D. Md. 2008) ("[B]oth the nature of harm (the damage to the [insured's] property) and the relationship (between a subcontractor and the house owner for whom he performs work) are sufficient to create a tort duty."); *Cash & Carry Am.*, 117 A.3d at 61–62 (allowing plaintiff to recover in tort because the plaintiff did not allege that the defendants, a contractor and sub-contractor, "negligently constructed a defective roof," but rather "that, in carrying out the roof replacement work, they carelessly used a torch so as to accidentally set fire to the roof of the townhouse[,]" which is a tort claim because "the risk of harm created by [defendant's] misuse of the torch in performing the roof replacement work . . . was personal injury and death and damage to personal property").[27]   Indeed, "'[a]t least reasonable care and precautions' are owed by a subcontractor performing work." *Pac. Indem. Co.*, 560 F. Supp. 2d at 430 n.6 (quoting *Klein v. Dougherty*, 87 A.2d 821, 825 (Md. 1952)).

Accordingly, Spiniello owed CSX a duty of care that was independent of any duty existing by operation of the Agreement with the City, and CSX's interests are entitled to legal protection. Spiniello's first argument for summary judgment fails.

---

[27] In distinguishing between liability in tort and contract, Maryland courts have recognized that "a contractor's liability for economic loss is fixed by the terms of his contract. . . . Tort liability is in general limited to situations where the conduct of the builder causes an accident out of which physical harm occurs to some person or tangible thing other than the building itself that is under construction." *Pac. Indem. Co.*, 560 F. Supp. 2d at 430 n.5 (quoting *Counsel of Co-Owners Atlantis Condo. Inc. v. Whiting–Turner Contracting Co.*, 517 A.2d 336, 344 (Md. 1986)). The nature of the risk of harm here—which included health and safety risks for employees and damage to CSX's filtration system— falls into the latter category.

### ii.    *Proximate Causation and Damages*

Spiniello contends that CSX cannot establish proximate causation or damages. "To be a proximate cause for an injury, 'the negligence must be 1) a cause in fact, and 2) a legally cognizable cause.'" *Pittway Corp. v. Collins*, 973 A.2d 771, 786 (Md. 2009) (quoting *Hartford Ins. Co. v. Manor Inn*, 642 A.2d 219, 230 (Md. 1994)).   Causation in fact, the first step of the inquiry, considers "whether defendant's conduct actually produced an injury." *Id.* If "only one negligent act is at issue," it is established by showing that "the injury would not have occurred absent or 'but for' the defendant's negligent act." *Id.* at 786–87. If "two or more independent negligent acts bring about an injury," causation in fact can be shown by establishing that "it is 'more likely than not' that the defendant's conduct was a substantial factor in producing the plaintiff's injuries." *Id.* at 787. The second step of the inquiry, legal causation, considers "whether the actual harm to a litigant falls within a general field of danger that the actor should have anticipated or expected." *Id.* at 787. "[T]he question of legal causation 'most often involves a determination of whether the injuries were a foreseeable result of the negligent conduct.'"  *Gambrill v. Bd. of Educ. of Dorchester Cnty.*, 281 A.3d 876, 901–02 (Md. 2022) (quoting *Pittway Corp.*, 973 A.2d at 788).

"To establish 'causation in the face of a summary judgment challenge, evidence which amounts to a probability, not just a possibility, must be identified by the non-moving party, to guard against "raw speculation" by the fact finder.'" *Casey*, 823 F. Supp. 2d at 351 (quoting *Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671–72 (D. Md. 1999), *aff'd*, 213 F.3d 632 (4th Cir. 2000)). "It is well established that, 'unless the facts admit of but one inference . . . the determination of proximate cause . . . is for the jury.'" *Pittway Corp.*, 973 A.2d at 792 (quoting *Caroline v. Reicher*, 304 A.2d 831, 835 (1973)).

Spiniello's arguments as to proximate causation only highlight the factual disputes in this

51

case and therefore do not support its Motion for Summary Judgment. First, it argues that CSX cannot establish Spiniello's actions proximately caused the contamination because CSX's own experts acknowledged that bacteria could have been present in the system before October 12, 2018 and that, because CSX did not conduct any baseline testing, it cannot establish whether the bacteria in the system was caused by Spiniello's discharge or CSX's decision to stop using chlorine. (ECF No. 103-1 at 23–25.) Even with only the events of October 12, 2018 in play as a basis for Spiniello's liability, it is undisputed the Spiniello discharged some amount of contaminated sewer water into the filtration system. While the extent of the injury attributable to events on October 12, 2018 may be in dispute, there is sufficient evidence in the record for a jury to find that Spiniello's actions caused some injury. At the very least, Spiniello has admitted to discharging 50–100 gallons. Based on Mendez's statements that he did not move the hose from where it was positioned when he started his shift on October 12, the fact that he was not caught until the evening, and that Spiniello crews discharged the vac truck four to five times during an eight-hour shift, a jury could find that the discharge on that day exceeded 50–100 gallons.

As to the second step in the proximate causation analysis, a jury could find that, based on the nature of Spiniello's work at the Facility and the known hazards of raw sewage, this was a foreseeable harm and thus Spiniello's actions are a legally cognizable cause of the injury. *See Gambrill*, 281 A.3d at 903 ("[T]he question of foreseeability will often be an issue for the jury[.]"

Additionally, Spiniello argues that CSX cannot prove its damages because CSX was not justified in treating the whole system as contaminated and cannot show that HEPACO's work to clean the entire system was reasonable and necessary given subsequent test results indicating lower levels of contaminants and the lack of clearance testing to prove HEPACO's work was successful. (ECF No. 103-1 at 25–27.)

52

"Following a determination that a defendant's conduct was a substantial factor in causing injury to a plaintiff, the fact finder must then determine an appropriate award of money damages." *Carter v. Wallace & Gale Asbestos Settlement Tr.*, 96 A.3d 147, 157 (Md. 2014) (footnote omitted). Compensatory damages "must be proved with reasonable certainty, and may not be based on speculation or conjecture." *Id.* (quoting *Asibem Assoc., Ltd. v. Rill*, 286 A.2d 160, 162 (Md. 1972)).

Once again, Spiniello's arguments merely highlight the factual disputes involved in an eventual award of damages, if Spiniello is found liable. The Court recognizes that, given its ruling excluding events prior to October 12, 2018 as a basis for liability, there may be difficult questions with regard to damages, which may need to be addressed before trial. *See Mayer v. N. Arundel Hosp. Ass'n, Inc.*, 802 A.2d 483, 491–95 (Md. Ct. Spec. App. 2002) (discussing principles of aggravation of an injury, divisibility of a harm, and apportionment of damages); *see also Carter*, 96 A.3d at 157 (explaining that when a question "arise[s] as to whether only a portion of the total damage award may properly be assigned to the defendant[,]" it is "primarily not one of the fact of causation, but of the feasibility and practical convenience of splitting up the total harm into separate parts which may be attributed to each of two or more causes"). Given the factual disputes that persist in this case, a determination as to damages would be premature at this juncture. *See In re Marriott Int'l Inc., Customer Data Sec. Beach Litig.*, Civ. No. SAG-19-654, 2023 WL 4351333, at *3 (D. Md. July 5, 2023) (noting that a district court may exercise its discretion to deny motions for summary judgment "because it believes that further development of the case is needed in order to be able to reach its decision" and that "courts have denied motions for partial summary judgment seeking to limit damages as 'premature' where 'liability has yet to be determined.'" (quoting 10A C. Wright, A. Miller & M. Kane, *Federal Practice & Procedure: Civil* § 2728 (4th ed. 2017) and

53

*Randolph v. PowerComm Constr. Inc.*, Civ. No. GJH-13-1698, 2014 WL 4981439, at *4 (D. Md. Oct. 1, 2014))). Accordingly, Spiniello's Motion for Summary Judgment on this basis will be denied.

### iii.   Contributory Negligence

"In Maryland, contributory negligence is a complete bar to recovery." *Leakas v. Columbia Country Club*, 831 F. Supp. 1231, 1235 (D. Md. 1993). "Contributory negligence is that degree of reasonable and ordinary care that a plaintiff fails to undertake in the face of an appreciable risk which cooperates with the defendant's negligence in bringing about the plaintiff's harm." *Kassama v. Magat*, 767 A.2d 348, 359 (Md. Ct. Spec. App. 2001), *aff'd*, 792 A.2d 1102 (Md. 2002) (quoting *McQuay v. Schertle*, 730 A.2d 714, 720 (Md. Ct. Spec. App. 1999)). For contributory negligence to bar recovery, the plaintiff's negligence must be a proximate cause of its injury. *See Cantrell v. Wirtgen Am., Inc.*, Civ. No. CCB-07-2778, 2011 WL 915324, at *11 (D. Md. Mar. 15, 2011) ("In Maryland, 'a plaintiff's own conduct may constitute a bar to recovery if that plaintiff is determined . . . to also be guilty of negligence which was a direct contributing cause of the injury.'" (quoting *Moran v. Faberge, Inc.*, 332 A.2d 11, 21 (Md. 1975))); *Kassama*, 767 A.2d at 359 ("Contributory negligence, if present, defeats recovery because it is a proximate cause of the accident; otherwise, the negligence is not contributory." (quoting *Batten v. Michel*, 292 A.2d 707, 711–12 (Md. Ct. Spec. App. 1972))). The defendant bears the burden of proving contributory negligence. *McQuay*, 730 A.2d at 720.

"Ordinarily, contributory negligence is a question of fact that is for the jury to decide." *McQuay*, 730 A.2d at 721. "Only when no reasonable person could find in favor of the plaintiff on the issue of contributory negligence should the trial court take the issue from the jury." *Id.*; *see also Cador v. Yes Organic Mkt. Hyattsville Inc.*, 269 A.3d 353, 360 (Md. Ct. Spec. App. 2022),

· *cert. denied sub nom. Yes! Organic Hyattsville v. Cador*, 273 A.3d 894 (Md. 2022) ("In order that a case may be withdrawn from the jury on the ground of contributory negligence, the evidence must show some prominent and decisive act which directly contributed to the accident and which was of such a character as to leave no room for difference of opinion thereon by reasonable minds." (quoting *Menish v. Polinger Co.*, 356 A.2d 233, 238 (Md. 1976)).

Spiniello argues that CSX was contributorily negligent in two ways: (1) it stopped disinfecting the stormwater in the system with chlorine, (ECF No. 103-1 at 20–21); and (2) it was per se negligent by failing to comply with the requirements of its Permit. (*Id.* at 19–20.)

Turning first to the issue of chlorination, Spiniello avers that, after October 3, 2018, "[a]ny natural bacteria present in the System was allowed to 'reproduce unchallenged within this System' for nine days before Mr. Mendez discharged rinse water into the System. As such, the bacteria in the System that CSX alleges was caused by Spiniello can be immediately traced 'to a want of ordinary care and caution' on CSX's part." (*Id.* at 21 (citation omitted).). CSX has pointed to evidence that it stopped chlorinating the water because there was an excessive level of chlorine already in the system, as well visual indicators of the extent of sewage contamination. Thus, a dispute of fact exists as to whether CSX was negligent in this regard and whether that alleged negligence proximately caused the injury. This is a question of fact for the jury.

As to the alleged Permit violations, Spiniello points to the fact that PCMA Systems was not properly certified by the Maryland Board of Waterworks and Waste Systems Operators as required by CSX's NDPES Permit, (*id.* at 7, 19); that CSX's Storm Water Pollution Prevention Plan, which it was required to have under the Permit, did not account for possible bacteria in stormwater runoff or other bacterial pollutants, (*id.* at 7–8, 19–20); and that CSX "failed to retain the records and information regarding monitoring activities and maintenance of the system," i.e.,

SCADA data. (*Id.* at 8, 20.) "[I]n Maryland, violation of a statute does not per se constitute negligence—unless the violation was a proximate cause of the injury." *Major v. CSX Transp.*, 278 F. Supp. 2d 597, 617 (D. Md. 2003) (citing *Hartford Ins. Co.*, 642 A.2d at 229).

Even if CSX was in violation of its Permit in the ways Spiniello identifies—a point that CSX also disputes (ECF No. 120 at 21–24)—Spiniello, as the party bearing the burden to prove contributory negligence, has not established that these alleged Permit violations proximately caused CSX's injury. Indeed, it has pointed to no evidence in the record that would indicate that these alleged Permit violations amounted to a failure to take reasonable and ordinary care that could have causally contributed to CSX's injuries. Accordingly, Spiniello is not entitled to summary judgment on contributory negligence.

### b. Count X: Trespass

Under Maryland law, "[t]he longstanding common law tort of trespass is generally defined as 'an intentional or negligent intrusion upon or to the possessory interest in property of another.'" *Uthus v. Valley Mill Camp, Inc.*, 246 A.3d 1225, 1239 (Md. 2021) (quoting *Litz v. Maryland Dep't of Env't*, 131 A.3d 923, 936 (Md. 2016)). "In order to prevail on a cause of action for trespass, the plaintiff must establish: (1) an interference with a possessory interest in [the plaintiff's] property; (2) through the defendant's physical act or force against that property; (3) which was executed without [the plaintiff's] consent." *Mitchell v. Baltimore Sun Co.*, 883 A.2d 1008, 1014 (Md. Ct. Spec. App. 2005). "Because the interference must be without the plaintiff's consent, consent, either expressed or implied, constitutes a complete defense, *so long as the scope of that consent is not exceeded.*" *Id.* at 1014–15 (emphasis added). "The alleged trespasser does not need to cause any actual damage to the property; nominal damages may be recovered for any unauthorized entry." *Alston v. Fed. Nat'l Mortg. Ass'n, Seterus, Inc.*, Civ. No. TDC-17-2938, 2018 WL

2938909, at *5 (D. Md. June 12, 2018) (citing *Tyler v. Cedar Island Club*, 122 A. 38, 39 (Md. 1923)).

Spiniello contends it is entitled to summary judgment on CSX's trespass claim because Spiniello had CSX's consent to be at the Facility and the incident did not interfere with CSX's possessory interest. (ECF No. 103-1 at 22–23.) Neither argument has merit.

First, CSX does not claim that Spiniello's crews were trespassing by conducting work on its property; rather, its' theory is that the raw sewage itself interfered with CSX's possessory interest. (*See* Compl. ¶ 99, ECF No. 1 ("The release and spread of raw sewage into the Facility's water filtration system and onto the Facility as a result of the Second Incident substantially interfered with CSX's possessory interests.").) A jury could easily find that, although Spiniello had permission to be on the property to conduct sewer remediation work, it did not have permission to discharge sewer water into the filtration system's drainage ditch. Accordingly, a dispute of material fact exists as to whether Spiniello's conduct exceeded the scope of CSX's consent.

Second, a jury could find that the contamination of raw sewage throughout the water filtration system interfered with CSX's possessory interest. Spiniello argues—without citing to legal authority—that "CSX did not allege that the incident interfered with its business or that CSX incurred any damages or losses related to an interruption in its business" and thus "the incident did not interfere with CSX's exclusive possessory interest in its property[.]" (ECF No. 103-1 at 23.) "A trespass occurs '[w]hen a defendant interferes with a plaintiff's interest in the exclusive possession of the land by entering or causing something to enter the land.'" *Shongo v. CSX Transportation, Inc.*, Civ. No. RDB-22-2684, 2023 WL 4027121, at *4 (D. Md. June 14, 2023) (quoting *Rosenblatt v. Exxon Co., U.S.A.*, 642 A.2d 180, 189 (Md. 1994)). To sustain a trespass claim, "a defendant's act must cause an invasion of the plaintiff's property by some tangible

matter." *Id.* (quoting *Schuman v. Greenbelt Homes, Inc.*, 69 A.3d 512, 526 (Md. Ct. Spec. App. 2013)); *see also Exxon Mobil Corp. v. Albright*, 71 A.3d 30, 94 (Md. 2013) ("[R]ecovery for trespass requires that the defendant must have entered or caused something harmful or noxious to enter onto the plaintiff's land."). A jury could find that the sewage water was a tangible matter that interfered with CSX's exclusive possession of the water filtration system. *Cf. Mayor & City Council of Baltimore v. Monsanto Co.*, Civ. No. RDB-19-0483, 2020 WL 1529014, at *11–*12 (D. Md. Mar. 31, 2020) (allowing trespass claim to proceed based on contamination of City's public water systems with toxic chemical compounds). Further, CSX has pointed to evidence that, as a result of the discharge of sewer water into the filtration system, it was forced to close the Facility for two days, HEPACO workers were on site for several months, and it was not able to fully use the system as designed until the cleanup was complete. Accordingly, a genuine dispute of material fact exists as to whether Spiniello's actions interfered with CSX's possessory interest, precluding summary judgment on CSX's trespass claim.

### 3. *CSX's Motion for Summary Judgment against the City*

CSX seeks summary judgment on three issues: "(1) [the] City's liability for breaching the Agreement; (2) the costs CSX incurred as a result of the City's actions; and (3) the City's contractual liability to CSX for the attorneys' fees and costs CSX incurred in enforcing the Agreement. (ECF No. 105-1 at 6.) The Motion will be denied.

#### a. *Breach of Contract*

"Under Maryland law, the elements of a claim for breach of contract are 'contractual obligation, breach, and damages.'" *Transamerica Premier Life Ins. Co. v. Selman & Co., LLC*, 401 F. Supp. 3d 576, 596 (D. Md. 2019) (quoting *Tucker v. Specialized Loan Servicing, LLC*, 83 F. Supp. 3d 635, 655 (D. Md. 2015)). "To 'prevail in an action for breach of contract, a plaintiff

must prove that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation.'" *Id.* (quoting *Taylor v. NationsBank, N.A.*, 776 A.2d 645, 651 (Md. 2001)). "Under the objective test of contract interpretation applied in Maryland, 'the written language embodying the terms of an agreement will govern the rights and liabilities of the parties, irrespective of the intent of the parties at the time they entered into the contract.'" *Blondell v. Littlepage*, 968 A.2d 678, 693 (Md. Ct. Spec. App. 2009), *aff'd*, 991 A.2d 80 (Md. 2010) (quoting *Sy-Lene of Wash., Inc. v. Starwood Urban Retail II*, 829 A.2d 540, 546 (Md. 2003)).

CSX identifies three ways in which it claims the City breached the Agreement: "(1) the City failed to notify CSX of damages to CSX's property and perform the work in a safe manner; (2) the City failed to indemnify CSX; and (3) the City failed to leave CSX's property in a similar condition that existed prior to the commencement of work at the Facility." (ECF No. 105-1 at 30.) CSX has not established that it is entitled to summary judgment for breach of the Agreement.

### *i.    Failure to Notify and Perform Work in a Safe Manner*

The Agreement provides that "CITY and the City's Agents shall notify [CSX] promptly of any loss, damage, injury or death arising out of or in connection with the Work." (Right of Entry Agreement ¶ 2.4, ECF No. 105-2.) CSX claims the City breached this provision and failed to ensure the work was performed in a safe manner, pointing to signs of negligence that City Inspectors should have acted upon and brought to CSX's attention prior to the incident on October 12, 2018, which would have allowed CSX to prevent the discharge giving rise to this lawsuit. (ECF No. 105-1 at 30–32; *see also* ECF No. 124 at 12–13 (focusing on infractions prior to October 12).) In light of the Court's ruling on the scope of conduct fairly encompassed in the Complaint, CSX is not entitled to summary judgment on these alleged failures to notify CSX of any damages, which arose out of the work prior to October 12, 2018.

### ii.   *Failure to Indemnify*

CSX next argues that the City breached its obligation to indemnify CSX for damages to its

property, as required by the Right of Entry Agreement. The indemnification provision contained

in the Agreement provides:

> To the maximum extent permitted by applicable law, CITY and the City's Agents
> shall indemnify, defend, and hold [CSX] and its affiliates harmless from and against
> all claims, demands, payments, suits, actions, judgments, settlements, and damages
> of every nature, degree, and kind (including direct, indirect, consequential,
> incidental, and punitive damages), for any injury to or death to any person(s)
> (including, but not limited to the employees of [CSX], its affiliates, CITY or the
> City's Agents), for the loss of or damage to any property whatsoever (including but
> not limited to property owned by or in the care, custody, or control of [CSX], its
> affiliates, CITY or the City's Agents, and environmental damages and any related
> remediation brought or recovered against [CSX] and its affiliates), arising directly
> or indirectly from the negligence, recklessness or intentional wrongful misconduct
> of the City's Agents, CITY, and their respective agents, employees, invitees, the
> City's Agents, or the City's Agents' agents, employees or invitees in the
> performance of Work in connection with this Agreement or activities incidental
> thereto, or from their presence on or about [CSX]'s Property, except for activities
> caused by the sole negligent act or omission of [CSX], its employees or agents.

(Right of Entry Agreement ¶ 2.1(a), ECF No. 105-2.)

However, CSX did not allege the second element of a breach of contract claim: that the

City breached its obligation to indemnify CSX. Indeed, the Breach of Contract claim (Count IV)

in the Complaint does not mention the indemnification clause or a breach of the duty to indemnify.

(Compl. ¶¶ 64–70, ECF No. 1.) In contrast, the Indemnification claim (Count V) does not allege

a breach, but rather is pled as a standalone request for indemnification. (*Id.* ¶¶ 71–75.) And, unlike

the allegation about the City's failure to pay in regard to the first incident that has now settled, (*id.*

¶ 20 ("On January 22, 2019, the City denied CSX's claim and/or refused to pay for damages related

to the First Incident")), CSX did not make a similar allegation as to the City's refusal to pay for

the damages resulting from the October 12, 2018 discharge. (*See id.* ¶ 41.)

Even if the Complaint sufficiently alleged a breach of the indemnification agreement, CSX has not supported its contention that there was a breach with evidentiary support. CSX only generally argues that "[i]n breach of this provision, the City has not indemnified or made CSX whole to date[,]" (ECF No. 105-1 at 32), and "the City is in breach of the Agreement for failing to indemnify CSX for the damage it caused." (*Id.* at 33.)    It asserts, without citing to evidence in the record, that "[g]iven [the MDE's] directive, nobody from Spiniello or the City reached out to CSX to coordinate with CSX to develop and finalize a treatment plan. Instead, CSX had to engage outside contractors to perform remediation of the Facility." (*Id.* at 25; *see also* ECF No. 124 at 5 ("[T]he City simply never made an effort to make CSX whole or remediate the property.").) Accordingly, CSX has not met its burden of establishing a *breach* for failure to indemnify.

### iii.    *Failure to Leave CSX's Property in a Similar Condition*

CSX claims that the City breached the Agreement for failing to leave the property in a similar condition. (ECF No. 105-1 at 33–34.) The Agreement provides that "*upon completion of the Work*, the Property shall be left in a condition, similar to the condition that existed prior to the work, satisfactory to Division Engineer or his or her duly authorized representative." (Right of Entry Agreement ¶ 10, ECF No. 105-2 (emphasis added).) CSX has not cited evidence about the condition of the property upon the completion of the work under the Agreement, the point in time that triggers this provision. Further, to the extent it argues the City breached this obligation by failing to take the lead on remediation efforts, it has not supported such an assertion with sufficient evidence as to what happened between the City and CSX in the immediate aftermath of the incident to show the absence of a material dispute of fact. Accordingly, under the plain language of the Agreement, it has not shown a breach of this provision.

61

### b. *Remediation Costs Owed to CSX*

CSX argues it is entitled, pursuant to the indemnification provision, to recover the $1,918,611.62 in environmental remediation costs it incurred. (ECF No. 105-1 at 37; *see also* ECF No. 124 at 7–12.) The City agrees that CSX is entitled to some amount in indemnification. (ECF No. 111-1 at 3, 10.) However, the City argues that "there are material disputes of fact over the nature and extent of contamination caused by the October 12, 2018 discharge and the reasonableness of costs for cleaning this contamination." (*Id.* at 10.) CSX counters that the indemnification provision is broad and does not contain a proximate causation requirement. (*See* ECF No. 124 at 7 ("[T]he law is clear that when an agreement to indemnify contains the language 'arising out of,' there is no requirement to establish proximate cause, only causation in fact is necessary." (citing *Mass Transit Admin. v. CSX Transp., Inc.*, 708 A.2d 298, 306–07 (Md. 1998) (interpreting indemnification provision with "arising out of" language and rejecting argument that more than something more than "but for" causation is required))).)

As CSX seems to acknowledge, while the Agreement is broadly worded, it does not eliminate the causation analysis. The remediation costs must still be found to "aris[e] directly or indirectly from the negligence, recklessness or intentional wrongful misconduct of" Spiniello or the City "in the performance of Work in connection with this Agreement or activities incidental thereto, or from their presence on or about [CSX's] Property, except for activities caused by the sole negligent act or omission of [CSX], its employees or agents." (Right of Entry Agreement at ¶ 2.1(a), ECF No. 105-2.) Given the factual disputes about the scope of contamination and appropriateness of remediation efforts, and weighing the evidence in the light most favorable to City, CSX has not established the absence of a genuine dispute of material fact as to this question.

62

### c. *Attorneys' Fees and Costs*

Finally, CSX seeks "a judicial determination that CSX is permitted to recover attorneys' fees and costs under the terms of the Agreement" in an amount subject to later determination. (ECF No. 105-1 at 38.)  The Agreement provides that "[i]n the event CITY or the City's Agents fails to comply with the terms and provisions of this Agreement, CITY agrees to pay and agrees that [CSX] shall be entitled to recover costs and expenses incurred by [CSX], including legal fees and expenses, to enforce the terms of this Agreement."  (Right of Entry Agreement ¶ 12, ECF No. 105-2.)  Absent a finding that that the City has failed to comply with the Agreement, a ruling on CSX's entitlement to attorney's fees would be premature.

Accordingly, CSX's Motion for Summary Judgment will be denied.

### III.    *Conclusion*

For the foregoing reasons, the various Motions to Dismiss (ECF Nos. 90, 91, 92, 93) and for Summary Judgment (ECF Nos. 103, 105) will be denied.  The Motion to Strike Plaintiff's Expert Purcell Pursuant to Rule 702 (ECF No. 95) will be granted.  The remaining Motions pertaining to expert witnesses (ECF Nos. 96, 97, 100) and the Motion to exclude evidence of events before October 12, 2018 (ECF No. 99) will be denied.  The Motion to Exclude or Redact Hearsay Statements (ECF No. 101) and Motion to Permit an Adverse Inference from the Fifth Amendment Invocations of Miguel Mendez (ECF No. 102) will be denied without prejudice.  A separate Order shall issue.

DATED this  $\underline{Z\mathcal{T}}$  day of August, 2023.

63

BY THE COURT:

James K. Bredar
Chief Judge

64